IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINDRAN PROPERTIES, LLC (SHORELINE) | ) | Case No. 20-2834 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |
| | ) | |
| | ) | |

## DECLARATION OF ANDREW BELEW IN SUPPORT OF CHAPTER 11 CASE

I, Andrew Belew, hereby declare under penalty and perjury.

1. I am the current President and Chairman of Better Housing Foundation, an Ohio not-for-profit company ("BHF"). BHF is the sole member of eight separate limited liability companies, each of which owns portfolios of affordable housing units. One such portfolio is the above-captioned debtor, Lindran Properties LLC (Shoreline) ("Lindran" or "Debtor").

2. I am also the President and Chairman of Lindran. As such, I am familiar with the Debtor's operations, day-to-day business, affairs, and books and records. I submit this Declaration to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of this Chapter 11 case.

3. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussion with present and former board members of BHF, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtor's operation and financial condition. In making this declaration, I have relied, in part, on information and materials that the prior owners of BHF have gathered, prepared, and provided to me.

4.  BHF was formed in 2015 for the purpose of acquiring portfolios of affordable housing in the greater Chicago area. The current BHF Board assumed control of Lindran and BHF on November 26, 2018.

**Lindran was Formed to Provide Affordable Housing**

5.  Lindran was formed as a single-purpose entity in 2016 for the purpose of acquiring 13 multi-family residential rental buildings in the south side of Chicago. Lindran's 13 multi-family residential buildings contain an aggregate of 262 separate affordable housing residential units (collectively, the "Property").

6.  The Debtor's Property acquisition was financed by the issuance of $13,560,000.00 of secured bond obligations consisting of $11,655,000.00 of Series 2016(A) tax-exempt bonds; $540,000.00 of taxable Series 2016(B) bonds and $1,365,000.00 Subordinate Series 2016(C) bonds (collectively, the "Bonds"). The Bonds were issued pursuant to a Trust Indenture dated as of July 1, 2016 (the "Indenture"), between the Illinois Finance Association (the "Issuer") and Wilmington Trust Company, the original Bond trustee (the "Prior Trustee"). UMB Bank, N.A. is the duly-appointed and acting successor trustee (the "Trustee") under the Indenture.

7.  The Bonds are secured, in part, by a Loan Agreement dated July 1, 2016 (the "Loan Agreement") between the Issuer and the Debtor. The proceeds of the Bonds were loaned to the Debtor pursuant to the Loan Agreement. The Loan Agreement and related loan documents were assigned to the Trustee to secure the repayment of the Bonds. The Bonds are also secured, in part, by certain Mortgage, Security Agreements and Financing Statements dated July 1, 2016 (collectively, the "Mortgage"), between the Debtor, as mortgagor, and the Prior Trustee, as mortgagee. The Mortgage and related mortgage documents have been assigned to the Trustee to

secure repayment of the Bonds.  The Trustee was granted a security interest, in part, in all the Debtor's building and improvements thereon.

**Lindran's Operations as a Provider of Affordable Housing**

8. Initially, Lindran was able to attract tenants who paid their rent using government –issued housing vouchers.  Lindran also believed that it would be exempt from paying real estate taxes because of its not-for-profit status.

9. When the Debtor acquired the Property, Mark DeAngelis, Integrus Realty Group LLC, and Desak Development Corp., entities that were controlled by DeAngelis, entered into management agreements to allow them to manage the Property.

10. DeAngelis, Integrus and Desak's management was horrific, at best.  The Property fell into disrepair and neglect and, ultimately, Lindran was named in approximately 200 separate housing court lawsuits in the Circuit Court of Cook County (the "Housing Court").  In these lawsuits, the City of Chicago sought to force Lindran, DeAngelis, Integrus and Desak to remediate various housing code violations that were causing the tenants inconvenience and making their units uninhabitable.  Although my current BHF Board had absolutely nothing to do with DeAngelis and the former board's actions, we are still associated with their dubious acts and the very tainted reputation of the former board.

11. Lindran's business model was flawed from the onset. It had insufficient capital, its business model was premised on not paying real estate taxes because it was a not for profit entity, and it was grossly mismanaged by the DeAngelis entities.  Once Lindran recognized it was required to pay real estate taxes, its carry cost increased and the funds available to maintain the Property decreased even further.  With less cash flow available, the Property continued to spiral into disrepair.  As a result of the disrepair and the unpaid real estate taxes, Lindran was no

3

longer able to obtain the government housing tenant vouchers, thus further eroding its ability to maintain the Property, which caused even more tenants to vacate. As a result of this downward spiral and the need to attract new capital for much-needed improvements, the former BHF Board began seeking outside guidance.

**Late-2018: The BHF Board Transitions to Current Ownership**

12. In August of 2018, a non-profit entity named Invest in America's Veterans Foundation ("IAVF"), took control of the BHF Board with the intent to operate, stabilize and rehabilitate the Property. By that time, all of BHF's previous board members had resigned. In November of 2018, IAVF informed me that as a result of what they learned during their due diligence, they felt they did not possess the knowledge, experience or capital to properly achieve this ambitious objective. Based on my background in dealing with distressed real estate, I believed my team possessed the skill set to rehabilitate the Property. We agreed to take over the BHF Board on November 26, 2018. By taking over BHF, we intended to improve BHF and its holdings, including the Debtor, and to enhance our resume as an enterprise specifically designed to assist other struggling, non-profit, real estate entities.

13. Once my team took over control, we began rehabilitating the Property and addressing the complaints that were the subject of lawsuits in the Housing Court. In order to preserve rehabilitation projects that were in process, we allowed Paper Street Properties, the property management company selected by the former BHF Board, to continue managing the day-to-day operation of the Property. While the complaints that were the subject of the Housing Court were being addressed and remediation of the Property initiated, BHF retained The Habitat Company ("Habitat"), a full-service Chicago-based real estate management company. Habitat was employed to prepare an analysis and report of the structural, foundational, plumbing and

4

electrical repairs necessary to make a comprehensive rehabilitation of BHF's holdings, including the Debtor. In April 2019, Habitat provided me with their comprehensive "Habitat Report." Upon reviewing the Habitat Report it was apparent to me that the Property was in significant disrepair and it would cost millions more than we had budgeted to fully rehabilitate the Property.

14. While Habitat was preparing its report, I was actively seeking to obtain funds from outside investors to rehabilitate the Debtor's assets and develop a viable exit strategy. Ultimately, as a result of the capital needs demonstrated by the Habitat Report and Lindran's inability to obtain outside funding, the Debtor and BHF agreed that the Debtor would relinquish control of the Property and allow receivers to be appointed over the Property. The Trustee did not object to the appointment of receivers.

15. Over the past six months, in light of the Debtor's inability to find outside funding, the Debtor has been actively involved in negotiating a transaction that would allow an infusion of new capital to rehabilitate the Property. Based on the significant challenges imposed by the Housing Court lawsuits, the physical disrepair of the Property, the immense ill will that was created by the DeAngelis entities and the numerous liens imposed on the Property by the city's Housing Court cases, there have been several marketing hurdles to overcome.

16. After months of difficult negotiations, the Debtor has been able to enter into a stalking horse bid with PRE Holdings 14, LLC, an Illinois limited liability company ("PRE"). PRE is an unrelated third party that has no connection to BHF, the Debtor, or any of its predecessors. PRE has offered to buy the Debtor's assets free and clear of liens, claims and encumbrances for $3,900,000, as adjusted for customary closing costs. The Debtor selected PRE over other stalking horse bidders because of its liquidity, strong reputation with the City of Chicago, and their vast real estate experience and holdings around the south side of Chicago.

**The Purpose of This Bankruptcy Case is to Transition the Property to a New Owner**

17. On January 31, 2020 the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois. The initial goal of the bankruptcy filing is to consummate a transaction, or a series of transactions under § 363 of the Bankruptcy Code with PRE or another third-party that makes a higher and better offer for the Property, free and clear of liens, claims and encumbrances. The Debtor believes that by consummating this transaction they will be able to transfer ownership of the Property to new owners who are better capitalized and more capable of completing the desperately needed restoration of the Debtor's assets, thus stabilizing the Property for the community and existing tenants.

18. The Chapter 11 case stands to protect the claims and interests of the Debtor's tenants, its creditors, the community, and other parties-in-interest.

19. In an effort to support a transaction to a well-capitalized owner, the Trustee has agreed to a carve-out of up to $300,000.00 from the sale proceeds of the Property to pay all professionals in the Chapter 11 case and the statutory fees imposed on behalf of the United States Trustee. The Trustee has agreed to an additional surcharge of its collateral for normal and customary seller-side closing costs. Thus, there is virtually no risk that this case will be administratively insolvent.

20. The Debtor is simultaneously filing a motion to establish bid procedures for the purpose of soliciting competing bids for the Property and, if no additional bid is obtained, then to consummate the sale with PRE.

21. The Debtor's goal in this Chapter 11 case is to achieve an orderly, efficient, consensual and successful transaction that maximizes the value of the Debtor's estate for both

6

the stakeholders and the tenants. I believe if the Court grants the relief requested in the sale hearing, the prospects of achieving those objectives and completing a successful transaction of the Debtor's assets will be substantially enhanced.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the forgoing statements are true and correct.

Dated: February 5th, 2020

_____
ANDREW BELEW

98305\394035\223049024.v1
223049024.4