*EXECUTION COPY*

## REAL ESTATE PURCHASE AND SALE AGREEMENT

THIS REAL ESTATE PURCHASE AND SALE AGREEMENT ("**Agreement**") is entered into as of January 17, 2020 ("**Effective Date**"), by and between Lindran Properties LLC, an Illinois limited liability company (the "**Seller**") and PRE Holdings 14, LLC, an Illinois limited liability company (the "**Purchaser**"), and approved by UMB Bank, N.A., the duly-appointed and acting successor trustee (the "**Trustee**") under the indentures for the Multifamily Housing Revenue Bonds: Shoreline Portfolio Project (Series 2016A, Taxable Series 2016B, Subordinate Series 2016C).

WHEREAS, Seller is the owner of fee simple title to certain parcels of real property as set forth on **Exhibit A**, attached hereto, all in Chicago, Illinois, together with all improvements thereon, if any (collectively the "**Property**");

WHEREAS, the Property is subject to and secured by a series of bonds issued by Seller (Multifamily Housing Revenue Bonds: Shoreline Portfolio Project (Series 2016A, Taxable Series 2016B, Subordinate Series 2016C) (collectively, the "**Bonds**")) and the Trustee is the duly-appointed and acting successor trustee under the indentures for the Bonds.  The Seller and Purchaser acknowledge that the liens of the Trustee securing the Bonds against the Property are valid, first priority liens;

WHEREAS, within fourteen (14) days after the Effective Date of this Agreement, Seller shall file a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**") to commence a bankruptcy case (the "**Bankruptcy Case**") and sell the Property free and clear of liens, claims, and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, except for any permitted encumbrances; and

WHEREAS, Seller desires to sell the Property to Purchaser, and Purchaser desires to purchase such Property from Seller, subject to the terms and conditions of this Agreement (the "**Sale**");

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth in this Agreement, Seller and Purchaser agree as follows:

1.      <u>Incorporation of Recitals</u>.  The Recitals to this Agreement are hereby incorporated into and made a part of this Agreement.

2.      <u>Purchase Price and Terms of Payment</u>.  The purchase price ("**Purchase Price**") for the Property is THREE MILLION NINE HUNDRED THOUSAND ($3,900,000.00) DOLLARS. The Purchase Price shall be paid by Purchaser as follows:

(a)      Within three (3) business day after the Effective Date of this Agreement, Purchaser shall (i) deposit FIFTY THOUSAND DOLLARS ($50,000.00) (the "**Earned Earnest Money**") with Clark Hill PLC, 130 E. Randolph St., Suite 3900, Chicago, Illinois 60601 ("**Clark Hill**"), which Purchaser and Trustee acknowledge that Seller may apply towards its attorneys' fees or costs incurred in connection with preparation of filing the Bankruptcy Case, and (ii) deposit ONE HUNDRED THOUSAND DOLLARS ($100,000.00) (together with the Earned Earnest Money, the

"**Earnest Money**") with the Title Company (as defined below) to be held as escrow agent pursuant to this Agreement and the Contract Receipt and Joinder attached hereto as **Exhibit B**.

(b)     At Closing (as defined herein below), if the Purchaser is the Successful Purchaser, the entire Earnest Money (including the Earned Earnest Money) shall be credited against the Purchase Price, and the balance of the Purchase Price shall be paid to Seller by cash or certified funds; provided, however, that the Purchase Price shall be adjusted to reflect the prorations between Purchaser and Seller set forth in the Agreement.

3.     Bid Procedures/Bankruptcy Court Approval. (a) On or within fourteen (14) days of the commencement of the Bankruptcy Case, Seller shall file with the Bankruptcy Court a motion (the "**Sale Motion**") for the entry of an order (the "**Bid Procedures Order**") approving, *inter alia*: (i) bid procedures for the sale of the Property (the "**Bid Procedures**"); (ii) this Agreement; (iii) notice of the assumption and assignment of executory contracts and unexpired leases; (iv) a hearing date for the approval of the Sale; (v) notice of the Sale; and (vi) for such other and further relief as necessary to consummate the Sale of the Property to the highest and best bidder (the "**Successful Purchaser**").

(b)     Purchaser is the stalking horse bidder for the Property and Purchaser shall be entitled to: (i) a break-up fee in cash of three percent (3%) of the Purchase Price (the "**Break-Up Fee**"), and (ii) any properly documented, reasonable costs and expenses incurred by Purchaser in negotiating and documenting the Proposed Transaction in an amount up to $100,000 (the "**Expense Reimbursement**") in the event an alternative sale or other transaction disposing of some or all of the Property (whether through a sale or plan of reorganization) is approved by the Bankruptcy Court that is not the Sale as set forth in this Agreement (an "**Alternative Transaction**"). In the event of an Alternative Transaction, the Purchaser's Break-Up Fee and Expense Reimbursement shall be paid from the cash proceeds of the Alternative Transaction at Closing. Seller's obligation to pay the Break-Up Fee and Expense Reimbursement as a result of an Alternative Transaction shall survive termination of this Agreement and shall constitute an administrative expense under Section 503(b)(1)(A) of the Bankruptcy Code, which shall be a superpriority administrative expense claim senior to all other administrative expense claims and payable out of the proceeds from any Alternative Transaction, prior to any recovery by the Trustee under Section 364(c)(1) of the Bankruptcy Code.

(c)     The Bid Procedures shall also provide for (i) overbid protection of FIFTY THOUSAND DOLLARS ($50,000.00) in excess of the aggregate of the Purchase Price, Break-Up Fee, and Expense Reimbursement; and (ii) payment of the Break-Up Fee and Expense Reimbursement due under this Section 3 within three (3) business days of the Closing Date of the Alternative Transaction, provided that such payment shall be made solely from the proceeds of the Alternative Transaction, subject to Section 3(d) of this Agreement.

(d)     The Trustee shall be allowed to credit bid for the Property pursuant to Section 363(k) of the Bankruptcy Code. If the Trustee is the Successful Purchaser in an Alternative Transaction, the Trustee shall pay the Purchaser its Break-Up Fee and Expense Reimbursement in cash within three (3) days of the Closing Date.

(e)     The Bid Procedures shall also provide that if either the Sale to Purchaser or an Alternative Transaction fails to close prior to termination of this Agreement pursuant to the terms set forth herein, including, without limitation, termination pursuant to Section 6 below, the Break-Up

Fee and Expense Reimbursement will not be paid to Purchaser, and Purchaser shall receive a return of the Earnest Money (less the Earned Earnest Money) within three (3) business days of the termination of this Agreement.

(f)  A hearing for entry of an order approving the Sale of the Property (the "**Sale Order**") shall occur no later than ninety (90) days after the filing of the Sale Motion.

4.  <u>Possession</u>.  Possession of the Property shall be delivered to Purchaser on the Closing Date (as defined herein), subject only to the Permitted Exceptions (as defined herein) and discharge of the Receivers (as defined herein).

5.  <u>Sale Order</u>.  The Sale Order shall be in form and substance satisfactory to Seller, Purchaser and the Trustee, and shall include the following provisions, among others:

(a)  approving the Sale of the Property to Purchaser on the terms and conditions set forth in this Agreement and authorizing Seller to proceed with the Sale;

(b)  stating that any objections filed with respect to the Sale of the Property that have not been withdrawn are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court to Purchaser's reasonable satisfaction;

(c)  finding that the Purchase Price (as defined in <u>Section 2</u> herein) represents fair value for the Property;

(d)  finding that the Sale is in the best interests of Seller's estates;

(e)  finding that Purchaser is a good faith Purchaser of the Property under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated;

(f)  providing that the Sale of the Property to Purchaser shall be free and clear of all liens, claims, encumbrances, and interests whatsoever under applicable sections of the Bankruptcy Code;

(g)  providing that the Purchase Price, less the Earnest Money, shall be paid by Purchaser to Seller immediately upon, and contemporaneous with the closing of the Sale, and shall be deposited by Seller in accordance to arrangements agreed to by the Trustee and the Seller;

(h)  except for the "Professional Fee Carve Out" (as defined in **Exhibit C** attached hereto), the Earnest Money, and any Break-Up Fee or Expense Reimbursement, all liens, claims, encumbrances and interests on the Property shall attach to the proceeds from the Sale with the same force, effect, validity and priority as such liens, claims, encumbrances and interests had on such Property prior to the closing of the Sale, subject to the liens and security interests of the Bonds and Trustee under the relevant agreements and indenture and applicable law and any cash collateral orders entered by the Bankruptcy Court;

(i)  providing that any Receivers' expenses which are allowed or authorized by any court or authority under applicable law shall attach to the proceeds from the Sale with the same force,

effect, validity and priority as provided by law, subject to the liens and security interests of the Bonds and Trustee under the relevant agreements and indenture and applicable law;

(j)      providing that the Receivers shall promptly turnover control and possession of the Property to Purchaser following the Closing, including, without limitation, all documents, books and records, and leases related to the Property;

(k)     providing that the Bankruptcy Court shall retain jurisdiction, among other things, for the purpose of enforcing the provisions of the Sale Order including, without limitation, compelling delivery of the Property to Purchaser and protecting Purchaser against any liens, claims, encumbrances, or interests against Seller or the Property not expressly assumed under this Agreement;

(l)      finding that no brokers' commissions are due from Purchaser in connection with the consummation of the Sale;

(m)    providing that the parties hereto shall be authorized to close the Sale immediately upon execution of the Sale Order;

(n)     authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; and

(o)     determining that Purchaser is not a successor to Seller or otherwise liable for any liabilities or assets excluded from assumption or purchase under this Agreement and permanently enjoining each and every holder of any of such excluded liabilities from commencing, continuing, or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Purchaser or the Property related thereto.

6.     Termination. Except as otherwise set forth in this Agreement, this Agreement shall terminate, and Purchaser shall receive a return of the Earnest Money, less the Earned Earnest Money, upon any of the following:

(a)(i)   the Bankruptcy Case is not filed within fourteen (14) days of the Effective Date; (ii) the Bid Procedures Order has not been entered by the Bankruptcy Court within sixty (60) days after the filing of the Bankruptcy Case unless such date is extended by order of the Bankruptcy Court or consent by the Purchaser, Seller and the Trustee; or (iii) the Sale Order has not been approved within ninety (90) days after filing of the Sale Motion; provided, however, that if Purchaser is selected as the back-up bidder at the conclusion of the auction, then this Agreement shall remain irrevocable and not terminate until thirty (30) days after entry of the Sale Order approving an Alternative Transaction (as defined in Section 3(b) herein); or

(b)     if at any time from the date of Purchaser's initial Inspections (October 18, 2019) prior to the Closing of the Sale, the Property shall be destroyed or materially damaged (meaning any damage the cost of which to repair objectively exceeds $350,000.00) by weather, wear or acts of vandalism or theft, fire or other casualty, or the Property is taken by condemnation, then Purchaser shall have the option of terminating this Agreement (and receiving a return of its Earnest Money, less the Earned Earnest Money) or accepting the Property as damaged or destroyed, together with the

proceeds of any award or insurance payable, which gross proceeds, Seller agrees to assign to Purchaser and deliver to Purchaser at the Closing.

7.     Receivership of Property.  This Agreement shall not be terminated or otherwise modified, altered, or affected (and Purchaser shall not be excused from the exercise and performance of any and all conditions and terms set forth in this Agreement) if the Bankruptcy Court allows any receiver duly appointed under any applicable law and by any applicable authority (collectively, the "**Receivers**") to remain in place or in control of any or all of the Property during the Bankruptcy Case. The Purchaser acknowledges that certain individual properties that comprise the Property may have been sold or transferred, within the ninety (90) day period prior to the Bankruptcy Case filing, by or through the Receivers or respective state court proceeding (each, a "**Sold Property**"). The Purchaser may elect to proceed with the Sale, without the Sold Property, and the Purchase Price shall be adjusted to reflect the value of the Sold Property (which shall be determined by the purchase price of the Sold Property) or, alternatively, terminate this Agreement and receive a return of the Earnest Money (less the Earned Earnest Money). Nothing herein nor any election of the Purchaser shall be deemed an admission or waiver of any right or defense the Seller has to any potential state court sale or Receiver sale of any Sold Property, including, without limitation, a violation of due process and avoidance and recovery under Chapter 5 of the Bankruptcy Code.

8.     Inspection.  Purchaser has made, at the sole expense of Purchaser, inspections and studies of the Property as Purchaser deems appropriate (collectively, the "**Inspections**").     If Purchaser desires to enter the Property and make physical inspections and/or review all contracts, leases, permits, environmental reports, financial statements, and other such books and records related to the ownership and operation of the Property within the possession and control of the Receiver, Purchaser shall coordinate entry and/or review with the Receiver appointed to the particular Property. Seller shall reasonably cooperate with Purchaser in the event any further Seller action is required to gain entry to the Property and/or conduct such Inspections.  Purchaser hereby agrees to indemnify, defend and hold harmless Seller from any and all damages, expenses, claims, liabilities and obligations of any kind or nature arising, directly or indirectly, from such Inspections already made or made in the future, including reimbursement of Seller's reasonable attorneys' fees in the event Seller obtains counsel for any matter arising out of the Inspections.  Except as expressly set forth herein, Purchaser shall be deemed to have waived any objection to the condition of the Property and to have approved the condition of the Property.  All costs related to Purchaser's Inspections or otherwise set forth herein shall be borne by Purchaser, regardless of whether the Sale to Purchaser is consummated.  Purchaser expressly agrees that the indemnity set forth herein shall be a continuing obligation of Purchaser and shall survive the Closing or termination of this Agreement.

9.     Purchaser's Designation of Assumed Service Contracts.  To the extent that any management, brokerage, leasing or other service contract (including, without limitation, all cable, internet, telephone, satellite, cell tower and other telecommunications contracts, together with any access and/or marketing agreements), equipment, labor or materials contracts, maintenance or repair contracts, or other agreements that are in force and effect and affect the Property or the management, leasing, operation, repair, or maintenance thereof (collectively, "**Service Contracts**") exists on or prior to that date which is twenty one (21) days after the entry of the Bid Procedures Order, Purchaser shall send written notice to Seller designating which Service Contracts, if any, Purchaser desires to have Seller assume or reject pursuant to Section 365 of the Bankruptcy Code. Seller shall then serve written notice to each counterparty to a Service Contract (the "**Service Contract Notice**"), as approved by the Bankruptcy Court, of Purchaser's intent to assume or reject such Service

Contracts, and such assumed Service Contracts shall be the "**Assumed Service Contracts**" to be assigned to Purchaser at Closing (and if Purchaser fails to make such designation, Purchaser shall be deemed to reject any such Service Contract).  Purchaser shall be responsible for paying all amounts necessary to cure any defaults under the Assumed Service Contracts (the "**Cure Amounts**") and for satisfying any requirements regarding adequate assurance of future performance that may be imposed under Section 365(b) of the Bankruptcy Code. Seller shall have no further responsibility for the payment of the Cure Amounts. Seller shall include in the Service Contracts Notice all proposed Cure Amounts and a deadline for any objection to the Cure Amount or assumption/rejection of any Service Contracts.

10.     No Representations or Warranties; AS IS Condition.   (a) Purchaser warrants, acknowledges and agrees with Seller that Purchaser is purchasing the Property in its "AS IS/WHERE IS" condition, "WITH ALL FAULTS" and with all physical latent or patent defects, and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature or type whatsoever from or on behalf of the Seller.  Purchaser acknowledges that Purchaser has not relied and is not relying upon any information, document, sales brochures or other literature, maps or sketches, projection, pro forma statement, representation, guarantee or warranty (whether express or implied, or oral or written, material or immaterial) that may have been given by or made by or on behalf of the Seller or Trustee.  Purchaser further acknowledges (i) that the Purchase Price may reflect deferred maintenance, and (ii) that Seller and Trustee are generally not familiar with the condition of the Property.

(b)     Purchaser hereby acknowledges that it shall not be entitled to, and shall not rely on the Seller, the Trustee or their agents as to (i) the quality, nature, adequacy or physical condition of the Property including, but not limited to, appurtenances, access, landscaping, parking facilities, sewage or utility systems, or facilities at the Property, if any; (ii) the quality, nature, adequacy or physical condition of soils or ground water at the Property; (iii) the existence, quality, nature, adequacy or physical condition of any utilities serving the Property or available at its boundaries; (iv) the development potential of the Property, its habitability, merchantability of fitness, suitability or adequacy of  the Property for any particular purpose; (v) the zoning or other legal status of the Property, including but not limited to, condemnation or threat of condemnation; (vi) the Property's operational compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions or restrictions of any governmental or quasi-governmental entity; (vii) the Property's operational compliance with any applicable labor laws or building codes concerning labor and material used or incorporated into the Property or any other labor or materials relating in any way to the Property; or (viii) the condition of title to the Property or the nature, status and extent of any right of way, lease, right of redemption, possession, lien, encumbrance, license, reservation, covenant, condition, restriction or any other matter affecting title to the Property except as may be set forth in the owner's policy.

(c)     Purchaser acknowledges and agrees with Seller and Trustee that, with respect to the Property, Seller and Trustee have not, do not, and will not make any warranties or representations, express or implied, or arising by operation of law, including, but in no way limited to, any warranty of condition, merchantability, habitability or fitness for a particular use, or with respect to the value, profitability or marketability of the Property. Purchaser acknowledges that Seller and Trustee have not, do not, and will not make any representation or warranty with regard to existence or non-existence at any time or hazardous waste or substances in the Property or on, at or under the surface of the Property or with regard to compliance with any environmental protection, pollution or land use

laws, rules, regulation, orders or requirements including, but not limited to, those pertaining to the handling, generating, treating, storing or disposing of any hazardous waste or substance, lead based paint or radon.

(d)     Purchaser acknowledges that it was Purchaser's responsibility to undertake such due diligence and to make such legal, factual and other inquiries and investigations as Purchaser deemed necessary, desirable or appropriate with respect to acquiring the Property. Such inquiries and investigations could have included, but were not be limited to, any oral or unrecorded leases and contracts pertaining to the Property, the physical components of all portions of the Property, the condition of the Property (including the existence of any hazardous or toxic wastes or other contaminants), the existence of any wood destroying organisms on the Property, such state facts as an accurate survey and inspection would show, the present and future zoning ordinances, resolutions and regulations of the city, county and state where the Property is located and the value and marketability of the Property.

11.     WAIVER AND RELEASE OF CLAIMS. PURCHASER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER OR TRUSTEE, ANY AGENT OF SELLER OR TRUSTEE OR ANY THIRD PARTY. PURCHASER AND ANYONE CLAIMING BY, THROUGH OR UNDER PURCHASER, EACH HEREBY FULLY RELEASES SELLER AND TRUSTEE, THEIR SUBSIDIARIES, AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS, PARTNERS, AND AGENTS FROM ANY AND ALL CLAIMS THAT IT MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLER OR TRUSTEE AND THEIR SUBSIDIARIES, AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS, PARTNERS, AND AGENTS FOR ANY COSTS, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATED TO OPERATION OF THE PROPERTY OR ANY CONDITION OF THE PROPERTY INCLUDING BY NO WAY OF LIMITATION CONSTRUCTION DEFECTS, ERRORS, OMISSIONS, OR OTHER CONDITIONS AFFECTING THE PROPERTY, BUT EXCLUDING ANY CLAIMS ARISING FROM OR RELATED TO SELLER'S NON-PERFORMANCE OR DEFAULT UNDER THIS AGREEMENT (THE "**RELEASED CLAIMS**"). PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THIS RELEASE OF THE RELEASED CLAIMS SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING, BUT NOT LIMITED TO, THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES, AND CAUSES OF ACTION. THIS COVENANT RELEASING SELLER AND TRUSTEE FROM THE RELEASED CLAIMS SHALL BE A COVENANT RUNNING WITH THE PROPERTY AND SHALL BE BINDING UPON PURCHASER AND ALL SUBSEQUENT OWNERS OF THE PROPERTY OR ANY PART THEREOF. PURCHASER FURTHER UNDERSTANDS THAT SELLER OR SOME OF SELLER'S PREDECESSORS IN INTEREST MAY BE OR BECOME INSOLVENT, BANKRUPT, JUDGMENT PROOF OR OTHERWISE INCAPABLE OF RESPONDING IN DAMAGES, AND PURCHASER MAY HAVE NO REMEDY AGAINST SELLER OR TRUSTEE OR SUCH PREDECESSORS, CONTRACTORS OR CONSULTANTS. THIS WAIVER AND RELEASE OF THE RELEASED CLAIMS SHALL SURVIVE THE CLOSING.

12.     Mold Disclosure.  Purchaser expressly acknowledges that the Property may contain mold or similar organisms.

13.     Title.  The Seller shall convey title to the Property free and clear of all liens, claims, encumbrances pursuant to Section 363(f) of the Bankruptcy Code to the Purchaser via a Special Warranty Deed ("**Deed**") subject only to:  general real estate taxes for 2019, that are not yet due and payable, and subsequent years; special taxes or assessments, if any, for improvements not yet completed; installments, if any, not due at the date hereof of any special taxes or assessment for improvements heretofore completed; building lines and building restrictions; private, public and utility easements; covenants and restrictions of record as to use and occupancy; the general exceptions to the Title Commitment (as defined herein) (which general exceptions may be removed at Purchaser's expense with the extended coverage endorsement); local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect relating to the Property; building code violations; pending building code violation court cases (for the avoidance of doubt, Purchaser will not take title subject to any judgments or monetary liens, including any receiver liens, costs, or fees, relating to any building violations and/or building violations court cases, which judgments or liens shall attach to the proceeds of the Sale); items appearing of record or that would be shown on a survey; and leases or tenancies, if any ("**Permitted Exceptions**").

14.     Survey; Title Insurance.  As of the Effective Date, Seller shall have delivered any existing survey of the Property in Seller's possession, if any, to Purchaser.

(a)  Purchaser, at its expense, shall be responsible for obtaining and paying for any updated survey (the "**Survey**") of the Property.  Purchaser shall not be obligated to obtain the Survey; provided, however, if Purchaser desires the Survey, then Purchaser shall obtain the Survey within thirty (30) days of the Effective Date.  If Purchaser does not obtain the Survey within thirty (30) days of the Effective Date, Purchaser shall be barred from objecting to any Survey matters or exceptions added to the Title Commitment (if any) arising from the Survey.

(b)     Title Commitment.  Title to the Property shall be good and merchantable and shall be conveyed to Purchaser free and clear of any and all liens, encumbrances, claims and interests of any kind or nature whatsoever except for the Permitted Exeptions, as defined above.

As evidence of such title, Seller shall, at its sole cost and expense, obtain and deliver (or cause to be delivered) to Purchaser, within thirty (30) days after the Effective Date, a commitment ("**Title Commitment**"), together with copies of all underlying title documents available to the Title Company, for an ALTA 2006 owner's policy of title insurance issued First American Title Insurance Company, 30 N. LaSalle, Suite 2200, Chicago, Illinois 60602 ("**Title Company**"), in which Title Commitment the Title Company shall agree to insure, for the full amount of the Purchase Price, merchantable and marketable fee simple title to the Property in the name of Purchaser, free of all exceptions (excluding specifically the standard exceptions) except the Permitted Exceptions.   The Title Commitment shall be conclusive evidence of good title as shown thereon.

(c)     Title Objections.  If the Title Commitment or, if applicable, the Survey, discloses any title defects (the "**Title Defects**"), other than the Permitted Exceptions, which are objectionable to Purchaser, Purchaser shall provide written notice to Seller of such unpermitted exceptions within five (5) business days after Purchaser's receipt of the Title Commitment ("**Title Objection Period**").

Seller shall have five (5) business days (herein "**Seller's Cure Period**") after the date of the Purchaser's objection notice to either: (i) agree to remove such Title Defects, or (ii) cause the Title Company to remove or insure over such Title Defects and to furnish the Title Commitment showing such Title Defects cured, removed or insured over. If the Title Defects are not cured within Seller's Cure Period or if Seller does not agree to cure within Seller's Cure Period, Purchaser may, upon notice to Seller within five (5) business days after the Seller's Cure Period and as its sole and exclusive remedy, either (i) terminate this Agreement, in which event this Agreement shall become null and void, and Seller shall cause the Earnest Money (less the Earned Earnest Money) to be returned to Purchaser, or (ii) accept title in the condition set forth in the Title Commitment and any Title Defects that Purchaser previously objected to, but now agrees to take subject to, shall be deemed Permitted Exceptions. Seller may but need not attempt to remove a Title Defect in order to facilitate the Closing, provided that under no circumstances shall Seller be obligated to cure or to remove any Title Defect. If Purchaser fails to advise Seller in writing of any objection to title to the Property within the Title Objection Period, Purchaser shall be deemed to have waived any such objection and shall be deemed to have approved the Title Commitment. Matters which are not objected to by Purchaser within the Title Objection Period shall be added to the Permitted Exceptions. Notwithstanding the foregoing, Purchaser shall have the right, at any time prior to Closing and at Purchaser's sole cost and expense, to update the Title Commitment, and to object to any new matters revealed by any such update (excluding survey matters) within five (5) business days after Purchaser's receipt of such update.

(d) <u>Owner's Title Policy</u>. At Closing, Seller, at Seller's expense, shall deliver to Purchaser an ALTA owner's title insurance policy insuring fee simple title to the Property in the amount of the Purchase Price showing Purchaser or its designee in title to the Property subject only to the Permitted Exceptions ("**Title Policy**"). Seller shall not be obligated to provide extended coverage over the general exceptions in the Title Commitment; provided, however, that Seller shall use commercially reasonable efforts to deliver such documents or affidavits as required by the Title Company and that are customarily required to provide extended coverage, including but not limited to Seller's closing deliveries set forth in Section 18(b) below.

15. <u>Real Estate Taxes</u>. Seller will pay or caused to be paid all general real property taxes that are billed and levied prior to Closing with respect to the Property on or before Closing. All general real property taxes that are levied with respect to the Property for the year prior to Closing and for the year of Closing which are not due and payable as of Closing will be prorated between Purchaser and Seller as of the Closing Date. The proration shall be calculated based upon 100% of the most recent assessed value, tax rate and equalization factor as of the Closing Date. For purposes of clarity, the parties will use the Cook County Assessor's assessed value of the Property effective as of the Closing Date, and if the assessed value of any particular property is $0.00, then there shall be no proration with respect to such property. The parties agree that there shall be no re-proration of real estate taxes and that all real estate tax prorations shall be final at Closing.

16. <u>Other Prorations</u>. (a) All items of income (including, without limitation, rents, if applicable) and expenses relating to the Property shall be apportioned between Purchaser and Seller on a cash basis as of 11:59 p.m. (local time where the Property is located) on the day immediately preceding the Closing Date and shall be adjusted against the Purchase Price due at Closing. All such prorations shall be final and binding on the parties.

(b)     Any other prorations and apportionments of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the Property is located.  For the avoidance of doubt, in the event final water and sewer charges as of the Closing Date are not ascertainable, Purchaser and Seller agree to use the most recent water and sewer bill to calculate any prorations due.

(c)     Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Section 16 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through 11:59 p.m. (local time where the Property is located) of the day preceding the Closing and Purchaser shall bear all such expenses and receive all such income accruing thereafter.

(d)     Seller shall have no obligation to provide any proration or apportionment to Purchaser for any amounts not actually received by Seller.

(e)     Cash on hand as of the Closing Date located at the Property, or in possession of the Seller, Seller's property manager, or the Receivers that is not related to tenant deposits or rental prepayments, shall be retained or credited to Seller and shall not be credited or payable to Purchaser.

(f)     Purchaser shall be responsible for the establishment of all utility services to the Property in the name of Purchaser or its designee as of Closing.

(g)     No security deposits or other tenant deposits shall be assigned at Closing.

17.     Closing; Location.  (a) Subject to Section 22, the closing (the "**Closing**") of the sale of the Property shall occur at offices of the Title Company in downtown Chicago, on that date which is fourteen (14) days after the entry of the Sale Order or as otherwise mutually agreed upon in writing by the Seller and Purchaser (the "**Closing Date**").

(b)     Escrow Closing.  This Sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the customary form of deed and joint order escrow agreement then in use by the Title Company, with such special provisions inserted in such escrow agreement as may be required to conform with this Agreement.  Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of Purchase Price and delivery of Deed shall be made through the escrow and this Agreement shall be deposited in the escrow.  For the avoidance of doubt, the entire amount of the Earnest Money shall be applied toward the Purchase Price.

18.     Deliveries at Closing.  (a) At Closing, Purchaser shall deliver or cause to be delivered to Seller the following:

(i)     Wired funds to the Title Company in the amount of the Purchase Price, less the total amount of Earnest Money (including the Earned Earnest Money) and any applicable credits plus any costs or expenses allocated to Purchaser in accordance with the terms and provisions of this Agreement;

(ii) Such affidavits, resolutions and other documents requested by Seller or required by the Title Company for a legal conveyance of real estate in the Cook County, Illinois, or otherwise required by the Title Company to issue the Title Policy; and

(iii) Evidence reasonably satisfactory to Seller and Title Company that the person executing the closing documents on behalf of Purchaser has full right, power, and authority to do so.

(b) At Closing, Seller shall deliver or cause to be delivered to Purchaser the following:

(i) The Sale Order;

(ii) Deed to the Property, together with appropriate real estate transfer declaration forms;

(iii) Certificate as provided in the Foreign Investment in Real Property Tax Act of 1980 (FIRPTA);

(iv) Evidence reasonably satisfactory to Purchaser and Title Company that any person executing the closing documents on behalf of Seller is properly authorized to do so;

(v) Full payment certificate or other governmental requirement in order to permit recordation of the Deed issued by the City of Chicago;

(vi) Certificate of Zoning Compliance issued by the City of Chicago for any Property that contains five or fewer dwelling units;

(vii) Quit Claim Bill of Sale;

(viii) Assignment of all leases encumbering the Property;

(ix) Assignment of the Surviving Service Contracts;

(x) Such affidavits, resolutions and other documents requested by Seller or required for a legal conveyance of real estate in the Cook County, Illinois, or otherwise required by the Title Company to issue the Title Policy; and

(xi) Any documentation reasonably requested by the Title Company in order to issue the extended coverage endorsement;

19. <u>Closing Expenses</u>. Purchaser shall pay for recording the Deed. Seller shall pay all costs related to title search fees and the base title insurance premium for the Title Policy to be issued to Purchaser. Purchaser shall pay for all endorsement charges (including extended coverage) and the title insurance premium for any loan policy, including endorsement charges related thereto. All escrow fees and Title Company closing charges shall be shared equally by Seller and Purchaser,

except Purchaser shall pay any escrow fees and other charges related to Purchaser's loan, if any. All state and county transfer taxes shall be paid by Seller. The costs of the City of Chicago transfer taxes shall be allocated between Seller and Purchaser as provided in the applicable ordinance. All other closing costs shall be allocated as customary in the City of Chicago.

20.     Representations by Seller. Seller represents and warrants to Purchaser as follows:

        (a)     Existence; Authority. Subject to the Sale Order, Seller has the requisite power and authority to enter into this Agreement and to execute and deliver Seller's closing documents.

        (b)     Title. Seller shall have at Closing good and marketable title to and interest in the Property with the authority to sell and transfer such title and interest to Purchaser under this Agreement free and clear of all liens, claims and encumbrances to the fullest extent permissible under section 363(f) of the Bankruptcy Code.

        (c)     FIRPTA. Seller is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate", as those terms are defined in Section 1445 of the Internal Revenue Code.

21.     Representation by Purchaser. Purchaser hereby represents and warrants to, and covenants and agrees with, Seller as to the following matters, with the understanding that Seller is relying on these representations, warranties and covenants in effecting the transactions contemplated hereby:

        (a)     This Agreement shall be binding and enforceable against Purchaser in accordance with its terms, and upon Purchaser's execution of any additional documents contemplated by this Agreement, they shall be binding and enforceable against Purchaser in accordance with their terms. The execution and delivery of the Agreement and Purchaser's performance of the obligations hereunder does not require any consents or approvals of any third persons.

        (b)     Neither Seller nor its servicers, employees, representatives, brokers, agents or assigns, have made any representations or warranties, implied or expressed, relating to the insurability or condition of the Property or the contents thereof.

        (c)     Purchaser has not relied on any reports, documentation, or other information relating to the Property, obtained by or provided by Seller in making a decision to purchase the Property; but rather, Purchaser has relied solely on its own independent assessment of the Property, including but not limited to occupancy and any leases that may exist.

        (d)     Purchaser represents that all regulatory and third-party approval necessary to consummate the Sale by the Purchaser (other than Bankruptcy Court approval) has been obtained.

        (e)     Purchaser represents that, subject to the provisions of Section 16, the Sale is not subject to (1) further due diligence by Purchaser, or (2) any other contingency that would prevent Purchaser from closing on the Sale (subject to Section 6 above)

(f)     Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and that it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Property. Purchaser will conduct such inspections and investigations of the Property as purchaser deems necessary and shall rely upon same. Upon closing, Purchaser shall assume the risk that adverse matters, including, but not limited to tenant defaults, may not have been revealed by Purchaser's inspections and investigations.

(g)     Purchaser fully understands the transaction contemplated by this Agreement and has such knowledge and experience in financial, business, and real estate matters that Purchaser is capable of evaluating the merits and risks of the investment in the Property. Purchaser has fully reviewed this Agreement inclusive of all disclaimers and waivers, with its counsel and understands the significance and effect thereof.

(h)     Purchaser has been advised and is aware that there may be existing occupants of the Property and that Seller is under no obligation to have any occupants vacate the Property prior to Closing.

(i)     Purchaser represents that it has a firm, irrevocable commitment for cash financing of the Purchase Price (accompanied by written evidence thereof or other evidence of Purchaser's ability to consummate the Sale; all such evidence to be provided to the Trustee upon reasonable notice prior to the execution of this Agreement) and other financial capabilities to consummate the Sale.

All representations, warranties and covenants made by Purchaser hereunder are true on the date hereof, shall be true as of the Closing and shall survive Closing.

22.     Conditions to Seller's Performance. Seller shall have the unilateral right, at Seller's sole and absolute discretion, but subject to Purchaser's rights under Section 6, to extend the Closing Date or to terminate the Agreement if:

(a)     The Purchase Price is insufficient to pay the sum of the closing costs, taxes, commissions and any liens on or obligations secured by the Property that Seller has agreed to pay hereunder; or

(b)     The Bankruptcy Court has not entered a final Sale Order approving the Agreement in form and substance satisfactory to Seller, Purchaser and the Trustee.

In the event Seller elects to terminate this Agreement as a result of any of the foregoing, prior to the filing of the Bankruptcy Case, the Earnest Money (less the Earned Earnest Money) shall be returned to Purchaser and the parties shall have no further obligation under this Agreement except the rights and obligations that by their intent survive termination.

23.     Personal Property. Purchaser acknowledges and agrees that items of equipment, fixtures, and other items of personal property ("**Personalty**") shall not be included in the sale of the Property or the Purchase Price unless each item is specifically described and referenced in this Agreement. Any Personalty equipment, fixtures, and other items of personal property at or on the Property may be subject to claims by third parties and, therefore, may be removed from the Property prior to or after the Closing Date. Seller makes no representation or warranty as to the condition of any Personalty or any personal property, title thereto, or whether any Personalty or personal property is encumbered by any liens. Purchaser assumes full responsibility for any Personalty and

other items of personal property remaining on the Property at the time of the Closing. ANY PERSONALTY OR PERSONAL PROPERTY SOLD BY SELLER SHALL BE ACCEPTED BY PURCHASER ON AN "AS IS, WHERE IS" BASIS WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE, AND SPECIFICALLY EXCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

24.     Condemnation.  In the event of any threatened, commenced or consummated proceedings in eminent domain affecting all or a material portion of the Property prior to Closing, Seller shall promptly notify Purchaser in writing, and Purchaser may, at its option, by delivering written notice to Seller within ten (10) days after Purchaser becomes aware or is notified of such proceedings, either (a) terminate this Agreement, in which the Earnest Money (less the Earned Earnest Money) shall be refunded to Purchaser, or (b) accept the Property subject to the proceedings, in which event Seller shall assign to Purchaser at Closing its entire right, title and interest to any condemnation award.

25.     Casualty.  In the event of damage to the Property by fire, vandalism, theft, weather damage, water damage or other casualty from the date of Purchaser's initial Inspections (October 18, 2019) prior to the Closing Date (a "**Casualty Event**"), Seller shall immediately notify Purchaser of such Casualty Event, and Purchaser may elect, by written notice to be delivered to Seller on or before the sooner of (a) the twentieth (20th) day after Purchaser's receipt of such notice from Seller, or (b) the Closing Date, to either: (i) close the transaction contemplated by this Agreement and receive all insurance claims and proceeds payable to Seller as a result of such Casualty Event, if any, with the same being paid or assigned to Purchaser at Closing, or (ii) terminate this Agreement, and receive a return of the Earnest Money (less the Earned Earnest Money), and upon such refund, neither party hereto shall have any further rights or obligations under this Agreement whatsoever, except for such rights and obligations that, by the express terms hereof, survive any termination of this Agreement. A Casualty Event shall only be deemed to exist in the event the cost to cure such exceeds Three Hundred Fifty Thousand Dollars ($350,000.00).

26.     Default; Remedies.  (a)  Seller Default.  If Seller defaults in its material obligations hereunder and provided Purchaser is not in default under this Agreement, Purchaser shall have the right, as its sole and exclusive remedy, to terminate the Agreement and the Earnest Money (less the Earned Earnest Money) shall be paid to Purchaser within three (3) business days and, upon receipt of the Earnest Money (less the Earned Earnest Money) by Purchaser, the parties shall have no further obligation to each other.

(b)     Purchaser Default.  In the event Purchaser shall fail to comply with any of its material obligations hereunder on or prior to the Closing, the Earnest Money shall be paid to Seller as liquidated damages in lieu of all other remedies available to Seller, and this Agreement shall become null and void with neither party having any further rights or liabilities hereunder, with the exception of any indemnification or other obligations of Purchaser as expressly provided in this Agreement.

(c)     Liquidated Damages.  Seller and Purchaser acknowledge and agree that (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Agreement; and (iii) retention by Seller of the Earnest Money upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

27.     Real Estate Broker. Each party hereby represents and warrants to the other party that it has not submitted this transaction to any broker, finder or other agent whatsoever, so as to cause any broker, finder or agent to be entitled to a broker's or finder's fee or commission with respect to this transaction. Each party hereby agrees to indemnify and hold the other free and harmless from and against all loss, cost, and injury suffered as a result of either party's breach of the foregoing warranty.

28.     Notices. Any notice required or permitted to be delivered under this Agreement shall be deemed to be delivered (a) whether or not actually received, when deposited in the United States mail, postage prepaid, certified or registered mail, return receipt requested, (b) when received, if delivered personally or sent by a nationally recognized overnight carrier, all charges prepaid, or (c) when received, when sent by electronic transmission (and accompanied by a copy sent by United States mail, first class mail, postage prepaid) and addressed to the Seller or Purchaser, as the case may be, at the addresses set forth below or at such other address as such party may designate by written notice to the other:

To the Seller:                    Clark Hill PLC
                                  Attn: Chad M. Poznansky
                                  130 E. Randolph, Suite 3900
                                  Chicago, Illinois 60601
                                  Email: cpoznansky@clarkhill.com


To the Purchaser:                 Krusha Patel
                                  Pangea Properties
                                  549 W Randolph St 2nd Floor,
                                  Chicago, IL 60661
                                  Phone: (312) 985-0560
                                  Fax: (847) 574-8179
                                  kpatel@pangeare.com

                                  and

                                  Eric E. Walker, Esq.
                                  Perkins Coie LLP
                                  131 S. Dearborn Street, Suite 1700
                                  Chicago, IL 60603
                                  Phone: (312) 324-8659
                                  Fax: (312) 324-9659
                                  ewalker@perkinscoie.com

To the Trustee:                Michael Slade, UMB Bank N.A.
                               120 6th Street South, Suite 1400
                               Minneapolis, MN 55402
                               Phone: (612) 337-7004,
                               Michael.slade@umb.com

                               and

                               William P. Smith
                               McDermott Will & Emery LLP
                               444 West Lake Street, Suite 4000
                               Chicago, IL 60606-0029
                               Phone: (312) 984-7588
                               wsmith@mwe.com

29.    Entire Agreement. This Agreement contains the entire agreement between Seller and Purchaser concerning the sale of the Property, and no statement, agreement, representation, or understanding shall be binding on either party unless it is contained in this Agreement. No modification of this Agreement shall be binding on either party unless in writing and signed by the parties. Seller and Trustee acknowledge that Purchaser and Better Housing Foundation, an Ohio not-for-profit corporation ("Better Housing"), have entered into that certain Portfolio Transition Services Agreement dated January __, 2020, a copy of which is attached hereto as **Exhibit D**. Better Housing is an affiliate of the Seller.

30.    Building Code Violations. Purchaser acknowledges there may exist building code violations against the Property, known or unknown. Purchaser hereby agrees to take the Property subject to building code violations and proceedings related to building code violations. Purchaser shall be solely responsible in making a determination relative to building code violations. Purchaser's consummation of the transaction shall be deemed approval of the condition of the Property, including existing building code violations. For the avoidance of doubt, Purchaser will not take title subject to any judgments or monetary liens, including any receiver liens, costs, or fees, relating to any such building violations and/or building violations court cases, which judgments and liens shall attach to the proceeds from the Sale (except the Earnest Money, Break-Up Fee, Expense Reimbursement and Professional Fee Carve-Out).

31.    Evictions. In the event Seller (or Seller's management company or a Receiver) has filed an eviction proceeding against one or more tenants, upon Closing, Purchaser shall maintain the proceeding and take all necessary steps to replace Seller as the plaintiff. Purchaser shall be responsible for all costs and expenses, including attorneys' fees, arising from the eviction proceeding after Closing. Notwithstanding the foregoing, if requested by Purchaser no more than ten (10) days before Closing, Seller shall request that the Receivers cause any pending eviction cases to be dismissed without prejudice.

32.     Exculpation. Except for the return of the Earnest Money (less the Earned Earnest Money) from the Title Company, Purchaser agrees to look solely to Seller's interest in the Property for the satisfaction of any liability or obligation arising under or in connection with this Agreement, the transactions contemplated hereby or the documents executed pursuant hereto, or for the performance of any of the covenants, warranties or other agreements contained herein or therein, and Purchaser shall not collect or attempt to collect any judgment or other amounts out of any assets of Seller or Trustee other than Seller or Trustee's interest in the Property. Further, Purchaser agrees that, other than the remedies set forth under Section 26, including the return of the Earnest Money (less the Earned Earnest Money), it does not have and will not have any claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, partner, member, principal, parent, subsidiary or other affiliate of Seller or Trustee, or any officer, director, employee, trustee, shareholder, partner, member or principal of any such parent, subsidiary or other affiliate, arising under or in connection with this Agreement, the transactions contemplated hereby or the documents executed pursuant hereto. The terms of this Section 32 shall survive the Closing and any termination of this Agreement for any reason.

33.     Recordation. Purchaser agrees not to record this Agreement or any memorandum hereof.

34.     WAIVER OF JURY TRIAL. THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS.

35.     Miscellaneous.  (a)  Assignment.  Purchaser may not assign this Agreement or Purchaser's rights hereunder without the prior written consent of Seller, which consent may be withheld by Seller for any reason or no reason.  No permitted assignment of Purchaser's rights under this Agreement will be effective against Seller until an executed counterpart of the instrument of assignment has been delivered to Seller and Seller has been furnished with the name and address of the assignee.

(b)     Time.  Time is of the essence of this Agreement.  If a time period would expire on a weekend day or a week day that is not a full business day, the time period will be extended to the next week day that is a full business day.

(c)     Amendment.  No provision of this Agreement may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement thereof is sought, and then only to the extent set forth in the instrument.

(d)     Governing Law.  This Agreement will be governed by, and construed in accordance with, the law of the State of Illinois.

(e)     Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.

(f)     Binding Effect. Subject to Paragraph 34(a), this Agreement will be binding on and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

(g)     Effective Date/Court Approval.  The Effective Date of this Agreement shall be the last date that either Purchaser or Seller executes this Agreement.  Except as set forth herein, this Agreement shall be null and void should the Bankruptcy Court not enter a Bid Procedures Order approving this Agreement.

*EXECUTION COPY*

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above appearing.

PURCHASER:                                          SELLER:

**PRE HOLDINGS**                                    **LINDRAN PROPERTIES LLC,**
**14, LLC**

By: _____                         By: Better Housing Foundation
Its: _Authorized Signatory_                          Its: Sole Member

                                                        By:_____
                                                            Andy Belew, President

Agreed to and approved by:

**UMB BANK, N.A.**

By: _____
Its: _____

146953414.1
222659930.v14

*EXECUTION COPY*

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above appearing.

PURCHASER:

SELLER:

**PRE HOLDINGS
14, LLC**

**LINDRAN PROPERTIES LLC,**

By: Better Housing Foundation
Its: Sole Member

By: _____
Its: _____

By: *Andrew Belew*
        Andy Belew, President

Agreed to and approved by:

**UMB BANK, N.A.**

By: _____
Its: _____

*EXECUTION COPY*

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above appearing.

PURCHASER:

**PRE HOLDINGS
14, LLC**

By: _____
Its: _____

SELLER:

**LINDRAN PROPERTIES LLC,**

By: Better Housing Foundation
Its: Sole Member

By:_____
    Andy Belew, President

Agreed to and approved by:

**UMB BANK, N.A.**

By: _____
Its: _____
    Michael G. Slade
    Senior Vice President

146953414.1
222659930.v14

## EXHIBIT A

### LIST OF PROPERTIES

| ADDRESS | PIN(s) |
|---|---|
| 62-80 E 68th Street / 6752-54 S Michigan Ave, Chicago, IL 60637 | 20-22-301-038-0000 |
| 1704-10 E 77th / 7655-57 S East End Ave, Chicago, IL 60649 | 20-25-310-011 |
| 7938-48 S Greenwood Ave, Chicago, IL 60619 | 20-35-105-030; 20-35-105-031; 20-35-105-032; 20-35-105-033; 20-35-105-034; 20-35-105-035; and 20-35-105-036 |
| 7500-04 S Cottage Grove Ave / 749-755 E 75th Street, Chicago, IL 60619 | 20-27-407-019; and 20-27-407-020 |
| 7800 S South Shore Drive, Chicago, IL 60649 | 21-30-414-025 and 21-30-414-026 |
| 1745-57 E 69th / 6900-06 S Cregier Ave, Chicago, IL 60649 | 20-24-318-022 |
| 7250 S South Shore Drive, Chicago, IL 60649 | 21-30-107-022 |
| 2050-60 E 72nd Place, Chicago, IL 60649 | 20-25-207-044; 20-25-207-025; and 20-25-207-026 |
| 2025-35 E 72nd Street, Chicago, IL 60649 | 20-25-207-039 |
| 1516 E 70th Street, Chicago, IL 60637 | 20-23-418-012 and 20-23-418-013 |
| 233-241 E 115th Street, Chicago, IL 60628 | 25-22-303-001 and 25-22-303-002 |
| 7451 S Eberhart Ave / 500-512 E 75th Street, Chicago, IL 60619 | 20-27-226-032 |
| 7719-23 S Yates Blvd, Chicago, IL 60649 | 21-30-318-005 |

## EXHIBIT B

## CONTRACT RECEIPT AND JOINDER

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, the Title Company[1] named in the Agreement, hereby agrees to be bound by the provisions of the Agreement relating to the holding and disbursement of all monies paid to the undersigned in escrow, and to disburse such sums strictly in accordance with the terms of such Agreement.

Intending to be legally bound, the undersigned has caused this Joinder to be executed by its duly authorized representative the 17 day of ___January___, 2020

FIRST AMERICAN TITLE
INSURANCE COMPANY

By: _____
Name: Tiana Ellis
Title: escrow officer

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Real Estate Purchase and Sale Agreement.

146953414.1
222659930.v14

*EXECUTION COPY*

## EXHIBIT C

"Professional Fees Carve-Out" shall consist of the first $300,000 paid out from the proceeds of the sale of the Property[1] The Professional Fees Carve-Out, pursuant to 11 U.S.C. § 506(c), shall not be subject to the liens of the Trustee or any other party asserting a lien in the proceeds of the sale, except with respect to any amount remaining after the payment of all professional fees and expenses as described herein. The Professional Fees Carve-Out shall be used to pay all fees and expenses of all professionals employed by the Seller, or any committee appointed during the Seller's Bankruptcy Case, pursuant to 11 U.S.C. § 327 in the Bankruptcy Case, in addition to the U.S. Trustee Quarterly Fees, chapter 11 filing fees, copy costs and publication costs, subject to the caveats below.

The Seller and Trustee agree to renegotiate the Professional Fees Carve-Out in the event:

- the Seller (solely at the direction of the Trustee) files any adversary complaint;

- the Seller is required to respond to any adversary complaint filed by any other entity, comply with discovery commenced in an adversary proceeding, or go to trial on such adversary complaint;

- the Seller (solely at the direction of the Bond Trustee) files an appeal of any order entered by the Bankruptcy Court that affects the Seller's ability to consummate a sale to a buyer;

- the Seller is required to respond to an appeal filed by any party to any order entered by the Bankruptcy Court that affects the Seller's ability to consummate a sale to a buyer; or

- the Seller is required to file and or prosecute objections to any claim.

In addition to the Professional Fees Carve-Out, the Trustee agrees that the Seller may surcharge the Trustee's collateral, pursuant to 11 U.S.C. § 506(c), to pay all normal and customary 'seller-side' closing costs (the "Closing Costs Surcharge"). Such seller-side costs typically include, but are not limited to, the seller's transfer taxes, title, escrow and wiring fees. The Closing Costs Surcharge for the sale of the Property to Purchaser at the Purchase Price shall not exceed $35,000; however, the Closing Costs Surcharge shall increase an additional $1,000 for every $100,000 the final purchase price exceeds the Purchase Price. For example, if the Property is sold to an overbidder for $4,200,000, the Closing Costs Surcharge would be limited to $38,000.

The Professional Fees Carve-Out does not include the $50,000 Earned Earnest Money that, pursuant to 11 U.S.C. § 506(c) and the Trustee's execution of the Agreement, shall be paid to Seller's attorneys prior to the Bankruptcy Case and in addition to the Professional Fees Carve-Out.

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Real Estate Purchase and Sale Agreement.

146953414.1
222659930.v14

**EXHIBIT D**

PORTFOLIO TRANSITION SERVICES AGREEMENT

*EXECUTION COPY*

## PORTFOLIO TRANSITION SERVICES AGREEMENT

This Portfolio Transition Services Agreement ("Agreement"), dated January _____17th_____, 2020, is by and between PRE Holdings 14, LLC, an Illinois limited liability company located at 549 W. Randolph St. 2nd Floor, Chicago, IL 60661 ("Owner"), and Better Housing Foundation, an Ohio not-for-profit corporation located at 4 Dunbar Road, Palm Beach Gardens, FL 33418 ("Manager").

Whereas, Owner wishes to acquire, own, and manage a significant number of multifamily apartment properties currently owned and controlled by an entity encumbered by Municipal Tax Exempt Bonds in the Chicago area, and thus, desires the assistance of an experienced entity that has the expertise to consult and assist Owner in and through the various acquisition and transitional stages associated with such an undertaking; and Manager, who possesses such expertise, wishes and agrees to consult and assist Owner with said endeavor under the following tenets, terms and guidelines:

## RECITALS

Owner desires to acquire ownership of the improved real property assets known as the Shorelines Portfolio and detailed in **Exhibit A** attached hereto (the "Properties"), which are owned by Lindran Properties LLC, an Illinois limited liability company ("Lindran"). Owner intends to enter into that certain Purchase and Sale Agreement with Lindran for the sale of the Properties. In connection with the acquisition, Owner seeks to retain Manager to consult on the transition of ownership of the Properties pursuant to the terms of this Agreement.

Owner may also, in its sole and absolute discretion, elect to employ Manager to assist Owner in the ongoing management and operation of the Properties pursuant to the terms of this Agreement. If Owner makes such election, Manager agrees to accept such engagement on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants herein contained, Owner and Manager agree as follows:

## ARTICLE I: DEFINITIONS

In addition to terms defined in other provisions of this Agreement, the following terms shall have the following meanings when used in this Agreement:

1.01   Term.   The term of this Agreement shall commence on the Commencement Date and continue for a period of eighteen (18) months unless sooner terminated by Owner in accordance with Article IX herein.

1.02   Property Mgt Depository Account.   An account maintained with an FDIC-insured bank designated by Manager and approved by Owner if and only if Owner, in its sole and

146953503.1

absolute discretion, elects to retain Manager as Property Manager pursuant to Article III of this Agreement.

1.03 <u>Working Capital Reserve.</u> A cash reserve in the amount of $10,000.00 shall be available to Manager during the Term hereof in connection with the operation of the Properties in accordance with the terms herein, if and only if Owner, in its sole and absolute discretion, elects to retain Manager as Property Manager pursuant to Article III of this Agreement.

1.04 <u>Fiscal Year</u> The period beginning on the Commencement Date of this Agreement through December 31st of that year; and subsequently, January 1st through December 31st of every year thereafter, if applicable.

1.05 <u>Budget.</u> A composite of: (a) an Operations Budget, which shall be an estimate of receipts and expenditures for the operation of the Properties during a Fiscal Year, including a schedule of expected apartment rentals (excluding security deposits) for the Fiscal Year, and (b) a Capital Budget, which shall be an estimate of capital replacements, substitutions and additions for the Properties (other than routine repairs and maintenance) for the Fiscal Year if and only if Owner, in its sole and absolute discretion, elects to retain Manager as Property Manager pursuant to Article III of this Agreement.

1.06 <u>Gross Collections.</u> The entire amount of all Properties' receipts, determined on a cash basis, from (a) tenant rentals and other sums collected pursuant to tenant leases (excluding security deposits, except as provided below) and other amounts collected for rental of the Properties, including garage income, parking fees and similar amounts, (b) income from concessions, including cable television, telephone, internet access, security monitoring, laundry and vending machines, (c) proceeds from rental loss or business interruption insurance, (d) any sums and charges collected in connection with termination of the tenant leases or settlement of rent claims and (e) application fees, cleaning fees, pet fees, redecorating fees and other similar miscellaneous income. Gross Collections do not include the proceeds of (i) any sale, exchange, refinancing, condemnation, or other disposition of all or any part of the Properties, (ii) any loans to Owner, whether or not secured by all or any part of the Properties, (iii) any capital contributions from Owner, (iv) any insurance (other than rental loss or business interruption insurance) maintained with regard to the Properties, (v) tenant reimbursements for utility costs, or (vi) security deposits (until applied to obligations that constitute Gross Collections).

1.07 <u>Property Employees.</u> Those persons employed by Property Manager on-site as a management staff (e.g., senior manager, manager, assistant managers, leasing consultants and maintenance personnel), including any personnel who work at the Properties on a part-time basis to the extent of the time they spend at the Properties. Property Manager shall maintain a Project Employee List on a continuing monthly basis of Project Employees assigned to the Project. All Project employees are employees of Property Manager. Should owner wish to continue to employ any project employees post termination of this agreement whether full-time, part-time or as a subcontractor/consultant a fee of 10% of each employee's annual salary is due and payable to Property Manager at that time. Property Manager is responsible for all employee costs above the property level unless said employee is fulfilling an existing site staff

role or function. All of the foregoing tenets are applicable if and only if Owner, in its sole and absolute discretion, elects to retain Manager as Property Manager pursuant to Article III of this Agreement.

1.08    Commencement Date.    The Commencement Date shall be the date upon which the sale of the Properties to Owner closes. Should the sale of the Properties to Owner not occur, this Agreement in its entirety shall be null and void and neither Owner nor Manager will have any further obligation thereof.

## ARTICLE II: CONSULTING SERVICES

Manager shall assist Owner with all aspects of the transition of ownership of the Properties from Lindran to Owner that may be reasonably requested by Owner for the duration of the Term of this Agreement (the "Consulting Services"). As consideration for the Consulting Services, Owner will pay Manager a one-time consulting fee equal to TWO HUNDRED AND SEVENTY-FIVE THOUSAND DOLLARS ($275,000.00) (the "Consulting Fee"). The Consulting Fee shall be remitted to Manager within three (3) business days after closing of the sale of the Properties to Owner. For the avoidance of doubt, the Consulting Fee is not contingent upon whether or not Owner elects to employ Manager as Property Manager pursuant to Article III of this Agreement.

## ARTICLE III: RETENTION OF MANAGER

Upon the Commencement Date, Owner shall have the option, in its soles and absolute discretion, to retain Manager as a property manager for any or all portions of the Properties (the "Property Manager"). Owner may exercise this option by providing written notice to Manager of its intent to retain Manager as Property Manager within three (3) business days following the Commencement Date. Notwithstanding any other provision of this Agreement, if Owner does not provide written notice to Manager regarding its intent to retain Manager as Property Manager in the manner required under this Article III, then the remaining provisions of this Agreement pertaining to property management (other than the Consulting Services provided in Article II of this Agreement) shall not apply, become null and void and neither Owner nor Manager shall have any further obligations under this Agreement other than the Consulting Services and payment of the Consulting Fee provided for under Article II.

## ARTICLE IV: DUTIES AND RIGHTS OF PROPERTY MANAGER

4.01    Appointment of Property Manager.    Property Manager agrees that for and in consideration of part of the compensation hereinafter provided, during the Term of this Agreement, Property Manager will supervise and direct the management and operation of the Properties. Everything performed by Property Manager under this Agreement shall be done as an independent contractor or agent of Owner. Property Manager is not responsible for parts of the Project during the construction or rehabilitation thereof (except any repair or restoration following a minor casualty), and Property Manager's responsibility to prepare a residential unit for occupancy shall begin upon the Commencement Date.

4.02    Rental Activities. Property Manager shall render the following services and perform the following duties for Owner with respect to the Properties: (a) use commercially reasonable efforts to collect all monthly rentals due from tenants and rent from users or lessees of other non-dwelling facilities in the Properties, if any, and at Owner's expense institute legal action to evict tenants delinquent in payment of monthly rental or other charges as more particularly described in Section 2.09 below; (b) when necessary, advertise at Owner's expense the availability of Properties for rental and, subject to limitations imposed by local laws or restrictive covenants applicable to the Properties, display "for rent" or other similar signs upon the Properties; and (c) use commercially reasonable efforts to lease apartment units in compliance with standards established by Owner using lease forms approved by Owner. Owner specifically authorizes Property Manager to execute leases in Owner's name and on Owner's behalf, consistent with the standards established by Owner, and any lease so executed will be binding on Owner to the same extent as if executed by Owner.

4.03 Budget.

(a) Property Manager shall submit a proposed Budget for a Fiscal Year to Owner for Owner's review no later than 45 days prior to the beginning of such Fiscal Year; provided that the proposed Budget for the first Fiscal Year shall cover the portion of such Fiscal Year beginning on the Commencement Date and shall be delivered not later than the first day of such period. Owner shall respond to a proposed Budget within 20 days after its receipt by Owner, and in the event Owner fails to act with respect to a proposed Budget or any part of a proposed Budget within such 20-day period, the proposed Budget or those portions which are neither approved nor disapproved shall be deemed to be approved.   In the event Owner disapproves a proposed Budget, in whole or in part, Property Manager shall immediately revise the Budget in accordance with the Owner's instruction.   Until a complete new Budget is approved, Property Manager shall operate on the part of the proposed Budget which is approved, and shall operate under the prior Budget until the new Budget is received and approved by the Owner.

(b) If applicable, the Budget shall constitute a major control under which Property Manager shall operate the Properties, and there shall be no substantial variances except as permitted by other provisions of this Agreement.   Consequently, except as permitted by other provisions of this Agreement, no expenses may be incurred or commitments made by Property Manager in connection with the maintenance and operation of the Properties which exceed the budgeted line item for the period in question by more than 1% without the prior consent of Owner; provided that the foregoing limitation shall not apply to expenses for mortgage payments, taxes, insurance, and utilities or other expenses deemed necessary for the survival of the project.

(c) If applicable, in the event there shall be a substantial variance of greater than 1% between the results of operations for any month and the estimated results of operations for such month as set forth in the Budget, Property Manager shall furnish to Owner, within twenty (20) days after the expiration of such month, a written explanation as to why the variance occurred. If substantial variances have occurred or are anticipated by Property Manager during the remainder of any Fiscal Year, Property Manager shall prepare and submit

to Owner, for review and approval by Owner, a revised Budget covering the remainder of the Fiscal Year with an explanation for the revision.

4.04  <u>On-Site Property Manager and Other Personnel.</u>

(a)  Property Manager shall determine the necessity for and budget for a Corporate Unit on the managed property.    If applicable, this unit will be a business expense budgeted for accordingly.  Said unit to include all utilities and be furnished from proceeds of the Properties.

(b)  If applicable, Property Manager shall investigate, hire, train, instruct, pay from project funds, promote, discharge and supervise the work of the Project Employees.    The Project Employees shall be employees of the project.

(c)  If applicable, Property Manager may request that a Project Employee be permitted to reside at the Properties and be available full-time in order to perform properly the duties of his/her employment.  The terms and conditions of the use of said residential unit shall be consistent with the approved Budget.

(d)  If applicable, Property Manager shall prepare or cause to be prepared, for execution and filing by Property Manager as an independent contractor, all forms, reports and returns required by all federal, state or local laws in connection with unemployment insurance, workmen's compensation insurance, disability benefits, social security and other similar taxes now in effect or hereafter imposed with respect to Project Employees.

(e)  If applicable, Owner shall reimburse Property Manager each pay period for the total aggregate personnel costs, including salary, fringe benefits, business travel, meals, lodging and processing costs payable with respect to the Project Employees, whether permanent or temporary employees.    The term "fringe benefits", as used herein, shall include Property Manager's standard fringe benefits offered to all project level employees.    Personnel costs shall be debited from Owner's operating account via ACH wire one (1) day prior to payment to Personnel.

(f)  If applicable, Property Manager shall institute its industry standard Bonus program.  This program may be adjusted from time to time but at any time will be properly accounted for in the budget.

4.05    <u>Contracts and Supplies</u>. Property Manager shall, in the name of and on behalf of Owner and at Owner's  expense, consummate arrangements with third party concessionaires, licensees and telephone, cleaning, furnace and air-conditioning maintenance, on-site licenses and supplies, pest control, landscaping and other similar items that are customarily provided in accordance with standards comparable to those prevailing in other first-class apartment projects in the geographic area in which the Properties is located.  Property Manager shall, where necessary, execute contracts in the name of and on behalf of Owner for such services and supplies if Owner authorizes Property Manager to enter into such contracts provided that Property Manager shall not execute any such contract unless the contract may be terminated without penalty on notice of 30 days or less. Owner recognizes that the Properties may be

operated in conjunction with other projects in an effort to provide for more efficient methods of operation, and Owner agrees that costs for such shared activities may be allocated or shared between the Properties and such other projects on an equitable basis.

4.06  Alterations, Repairs and Maintenance.

(a)  Property Manager shall, at Owner's expense, maintain the Properties in good repair and condition, consistent with the standard of care set forth herein, including in Section 4.06(c). Property Manager shall, in Owner's name and at Owner's expense, hire and discharge independent contractors for the repair and maintenance of the Properties to the extent involvement of outside parties is necessary for completion of such work. Expenditures for maintenance and repair are subject to the previously approved line item Budget-related limitations of this Agreement, except in the case of emergency repairs necessary to prevent injury to residents or others on or about the Properties or damage to the Properties or property of others located on or about the Properties, in which case expenditures may be made by Property Manager without prior approval and irrespective of the cost limitations imposed by this Agreement, but Owner shall be notified as soon as practicable.

(b)  If applicable, Property Manager shall, with Owner's approval, implement capital replacements, substitutions and additions for the Properties that are provided for in the Capital Budget. Owner shall be responsible for all costs of such capital replacements, substitutions and additions for the Properties and Owner shall pay all such costs directly and reimburse Property Manager for any such costs incurred by Property Manager. Property Manager shall receive a fee for such oversight of capital replacements in accordance with Section 5.01.

(c)  If applicable, Property Manager is not responsible for uncovering violations of building, zoning, subdivision, fire or other codes or other laws and regulations (including laws relating to accessibility) or for defects or other shortcomings in the Properties or its construction. Property Manager's responsibility as to such matters will be limited to advising Owner of problems that come to the attention of Property Manager and implementing, at Owner's authorization and cost, remedial steps directed by Owner on terms consistent with Section 4.06(b).

4.07  Licenses and Permits.  Property Manager shall, in a timely manner, apply for, obtain and maintain all licenses and permits (including deposits and bonds) required for Property Manager in connection with the management and operation of the Properties. Owner agrees to execute and deliver any and all applications and other documents and to otherwise cooperate to the fullest extent with Property Manager in applying for, obtaining and maintaining such licenses and permits. Owner will be responsible for all licenses and permits required for the Properties, and Property Manager will have no obligation to obtain any of such licenses and permits. However, Property Manager agrees to cooperate with Owner in processing applications for permits and licenses that Owner pursues for the Properties.

4.08  Compliance with Laws. Property Manager shall comply with all applicable laws applicable to it in the performance of its duties hereunder, including laws prohibiting

discrimination in housing, employment laws (including those related to unfair labor practices), laws regarding tenant security deposits and laws regarding the storage, release and disposal of hazardous materials and toxic substances: including without limitation, asbestos, petroleum and petroleum products by Property Manager. Property Manager shall not be responsible for compliance with laws relating to the condition of the Properties, including building, zoning, subdivision, fire and other codes or laws, including laws regulating hazardous materials or toxic substances (except as applied to materials released by Property Manager or Project Employees), but Property Manager shall notify Owner of any violation of any such laws of which Property Manager becomes aware. Property Manager and Owner each shall notify the other of any notice of violation of law with respect to the Properties that it receives from any governmental authority or any notice of violation or required corrective action that it receives from any board of fire underwriters or similar agency.

4.09   Legal Proceedings. Property Manager shall institute, in its own name or in the name of Owner, but in any event at the expense of Owner, legal actions which Property Manager deems appropriate to collect charges, rent or other income from the Properties, or to dispossess tenants or other persons in possession who default, or to cancel or terminate any lease, license or concession agreement for the breach thereof if and only if Owner, in its sole and absolute discretion, elects to employ Property Manager in some continuous property management capacity.

4.10   Security Services. Owner acknowledges that Property Manager has not undertaken to provide, and is not responsible for providing, security services to the Properties. Should Owner choose to do so, Owner may separately contract with a company providing alarm monitoring, patrol or similar services but Property Manager shall have no responsibility in respect of those services.

## ARTICLE V: FEES; PAYMENTS TO MANAGER

5.01   Management Fee. If Owner provides written notice of its intent to employ Manager as Property Manager pursuant to Article III of this Agreement, Owner shall pay to Manager, as compensation for its operating management services, the following management fee.   The "Base Management Fee" shall be a flat $75.00 per unit managed, which equals Twenty-One Thousand and Seventy-Five Dollars ($21,075.00) per month (as currently calculated). Additionally, Owner shall pay Manager, as compensation for its oversight of major construction/renovation projects, capital replacement projects, and a capital replacements management fee of Ten Percent (10%) of the total capital replacement cost as implemented.

5.02   Place of Payment. All sums payable by Owner to Manager hereunder shall be wire transferred to Manager using the wiring instructions set forth on **Exhibit B**, attached hereto unless Manager shall, from time to time, specify a different account to Owner in writing.

5.03   Reimbursement of Expenses. Owner shall be liable for the costs and expenses of maintaining and operating the Properties. Except as otherwise specifically provided in this Agreement, Owner shall pay, or shall reimburse Property Manager for, all costs and expenses incurred by Property Manager in connection with the maintenance or operation of the

Properties or performance by Property Manager of its duties under this Agreement. Purchases of, or contracts for, materials or services may be made in bulk by Property Manager in connection with its operation of apartment projects generally, and Owner agrees that the pro rata portion of the costs of such materials or service used in connection with, or for the benefit of, the Properties shall be allowed as a reimbursable cost hereunder. Owner shall not be obligated to reimburse Property Manager for expenses for office equipment or office supplies of Property Manager (unless incurred for the Properties), for any overhead expenses of Property Manager incurred with respect to its general offices, or for any salaries of off-site supervisory personnel of Property Manager. Property Manager shall not be obligated to make any advance to or for the account of Owner or to pay any sums except out of funds in the Depository Account. Property Manager will be excused from performance of its responsibilities under this Agreement to the extent that funds are not available in the Depository Account to pay related expenses (other than expenses for which Property Manager is not entitled to reimbursement under the terms of this Agreement) and Owner does not provide funds within five days after request of Property Manager.

## ARTICLE VI: HANDLING RECEIPTS AND OPERATING CAPITAL

6.01 <u>Bank Deposits</u>. All monies received by Property Manager for, or on behalf of, Owner shall be deposited by Property Manager in the Depository Account. All monies of Owner held by Property Manager pursuant to the terms hereof shall be held by Property Manager in trust for the benefit of Owner to be disbursed as herein provided, and such funds shall not, unless Owner otherwise has agreed or directed, be commingled with the funds of any other project, company or person, including Property Manager or any affiliate of Property Manager.

6.02 <u>Security Deposit Account</u>. Property Manager shall comply with all applicable laws with respect to security deposits received from tenants in respect of the Properties. All security deposit funds held by Property Manager shall at all times be the property of Owner, subject to all applicable laws with respect thereto.

6.03 <u>Disbursement of Deposits</u>. Property Manager shall disburse funds in the Depository Account on behalf of Owner for payment of Properties expenses incurred by Property Manager in the performance of its duties hereunder and other Properties expenses identified to Property Manager by Owner. Owner specifically authorizes Property Manager to expend funds in the Depository Account as contemplated by other provisions of this Agreement.

6.04 <u>Working Capital.</u> Within three (3) business days of the Commencement Date, Owner shall deposit the Working Capital Reserve into the Depository Account. As more fully described in Section 6.03, Owner shall also deposit in the Depository Account funds sufficient to pay the expenses of the Properties to the extent that such expenses exceed funds derived from the operation of the Properties.

6.05 <u>Excess Funds.</u> Any funds in the Depository Account in excess of the Working Capital Reserve shall be transferred from time to time, at Owner's direction, to an account of Owner's choice.

6.06  <u>General Provisions.</u>  Persons designated by Property Manager and approved by Owner in its sole and absolute discretion from time to time shall be authorized signatories on all bank accounts established by Property Manager hereunder and shall have authority to make disbursements from such accounts, and to the extent necessary, Owner shall make arrangements with the related depository to authorize such action by those persons. Funds may not be withdrawn by Owner from any account established hereunder, except in the case of Property Manager's default hereunder that would allow Owner to exercise its rights to terminate the Term. All persons designated by Property Manager as authorized signatories or who otherwise handle funds for the Properties shall be covered by fidelity insurance maintained by Property Manager but at Owner's cost with coverage in the minimum amount of $1,000,000. Property Manager shall have no liability for loss of funds due to the insolvency of any depository institution, even if the amount of funds maintained exceeds the available federal or other deposit insurance.

**ARTICLE VII: ACCOUNTING**

7.01  (a)  Books and Records.  Property Manager shall keep, or shall supervise and direct the keeping of, a comprehensive system of office records, books and accounts pertaining to the Properties.  Such accounts shall be maintained in accordance with generally accepted accounting principles (modified cash) unless otherwise specified by Owner. Such records shall be subject to examination at the office where they are maintained by Owner or its authorized agents, attorneys and accountants at reasonable hours on reasonable advance notice. Property Manager shall preserve all invoices at the Properties or as otherwise directed by Owner. Property Manager shall pass through to Owner any Accounting Consulting expenses incurred on a prorated basis.

7.01    (b)  Financing or Refinancing.   The application for financing or refinancing creates significant demand for and production of documents and other business items that are not covered by normal business operations of this agreement. The fee for this work shall be 1% of the loan amount applied for.   Payment shall be Five Thousand Dollars ($5,000.00) nonrefundable up front paid to Property Manager from operations to commence the project. This remaining fee shall be deducted at close and the amount remaining paid by proceeds of the note.  If for any reason the process fails to close, the remaining payment will not be charged.

7.02  Periodic Statements.

(a)  Within 20 working days following the end of each calendar month, Property Manager shall deliver, or cause to be delivered, to Owner: (i) an income and expense statement showing the results of operation of the Properties for the preceding calendar month and the Fiscal Year to date; (ii) a comparison of actual income and expenses with the income and expenses projected in the Budget; (iii) a statement of cash balances for the Depository Account and any security deposit accounts as of the last day of such month; (iv) a bank reconciliation; and (v) a written discussion of variance between budgeted and actual results.

(b)   Within forty-five (45) days after the end of each Fiscal Year, Property Manager shall deliver, or cause to be delivered, to Owner an income and expense statement showing results of operation of the Properties for the prior Fiscal Year.  If requested by Owner, Property Manager will cooperate with Owner in an audit of such Fiscal Year financial statement by an independent certified public accountant selected and paid for by Owner.

(c)  Owner may request, and Property Manager shall provide within a reasonable period after such request, such additional leasing and management reports that relate to the operations of the Properties as are customary for other similar properties.  Owner shall be liable for all costs incurred by Property Manager in the preparation of any such additional reports and in collecting and analyzing related data.

(d)  The Property Manager shall be responsible or making sure the federal and state income tax returns are provided within sixty (60) days of year end.  The cost of the tax preparation shall be borne by Owner.

## ARTICLE VIII: GENERAL COVENANTS OF OWNER AND PROPERTY MANAGER

8.01  Owner's Right of Inspection and Review.   Owner, its lenders and their respective accountants, attorneys and agents shall have the right to enter upon any part of the Properties at any reasonable time during the Term of this Agreement for the purpose of examining or inspecting the Properties, but any inspection shall be done with as little disruption to the business of the Properties as possible and subject to rights of tenants to limit or prohibit access to space in their possession.

8.02  Indemnification.

(a)  Property Manager shall not be liable to the Owner for any loss or damage not caused by the Property Manager's own gross negligence or willful misconduct, and said Owner will and does hereby indemnify and hold harmless the Property Manager from any such liability for damages, costs and expenses arising from injury to any person or property in, about and in connection with the Properties from any cause whatsoever, unless such injury shall be caused by said Property Manager's own gross negligence or willful misconduct.

(b)  Owner shall not be liable to Property Manager for any loss or damage not caused by the Owner's own gross negligence or willful misconduct, and said Property Manager will and does hereby indemnify and hold harmless the Owner from any such liability for damages, costs and expenses arising from injury to any person or property in, about and in connection with the Properties from any cause whatsoever, unless such injury shall be caused by said Owner's own gross negligence or willful misconduct, excluding any of such matters for which Property Manager is responsible under this Agreement.

(c)  An Indemnitee shall notify the Indemnitor of any claim with respect to a matter described in Section 8.02 (a) or (b) (each a "Claim") promptly after the Claim is asserted against the indemnitee and the indemnitee shall cooperate with the indemnitor in the defense of the Claim. Until an indemnitor has notified the indemnitee whether the indemnitor will accept responsibility

for the defense of a Claim made against the indemnitee, the indemnitee shall take reasonable steps to preserve all defenses against the Claim. An indemnitor may not settle any Claim against an indemnitee on terms that (i) provide for a criminal sanction or fine against the indemnitee, (ii) admit to criminal liability on the part of the indemnitee, (iii) provide for injunctive relief against the indemnitee or (iv) provide for monetary damages payable by the indemnitee in excess of the amount for which the indemnitor is liable under this Agreement. At its option, an indemnitee may participate, with counsel of its choice, in the defense of any Claim asserted against it, but except for costs reasonably incurred in preserving defenses, the indemnitor will not be responsible for the costs (including attorneys' fees) incurred by the indemnitee in so doing.   In all events, participation in the defense of a Claim by an indemnitee may not interfere with the defense against the Claim by the indemnitor.

(d) Property Manager's obligations under Section 8.02(a) are excused to the extent that indemnity and defense is provided to Owner by either Owner's insurers or Property Manager's insurers. Owner's obligations under Section 8.02(b) are excused to the extent that indemnity and defense is provided to Property Manager by Owner's insurers. This Section 8.02(d) does not absolve a party from responsibility for defense in respect of Claims that are within the scope of its indemnity if an insurer does not actually provide the defense for any reason (including because the insurer wrongfully denies coverage), nor does it absolve a party from responsibility for indemnity against a Claim that is within the scope of its indemnity if an insurer does not actually pay the Claim for any reason (including because the insurer wrongfully denies coverage or the Claim exceeds the available coverage).

(e) The indemnity obligations of the parties in this Agreement shall survive expiration or earlier termination of this Agreement.

8.03   Covenants Concerning Payment of Operating Expenses. Owner covenants to pay all sums for expenses of maintaining and operating the Properties to the extent that such expenses exceed receipts from the Properties available in the Depository Account. Such deposits shall be made upon written notice from Property Manager within five (5) days after receipt by Owner of written notice. The minimum balance shall be ten thousand dollars.

## ARTICLE IX: DEFAULTS AND TERMINATION RIGHTS

9.01   Default by Property Manager. Property Manager shall be deemed to be in default hereunder in the event Property Manager shall fail to keep, observe or perform any covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Property Manager and Property Manager does not cure such default within thirty (30) days after written notice thereof by Owner to Property Manager or, if such default cannot be cured within thirty (30) days, then within such additional period as shall be reasonably necessary to effect a cure so long as Property Manager commences efforts to cure within the original 30-day period and thereafter diligently pursues the cure.  If for any reason Owner terminates the agreement early then a termination fee of 50% of the remaining balance of the Base Management Fee owed under this Agreement and not less than one month's Base Management Fee shall be assessed and due immediately.

9.02  Remedies of Owner. Upon the occurrence of an event of default by Property Manager as specified in Section 9.01 hereof, Owner shall have the right to terminate this Agreement with thirty (30) days written notice.

9.03  Defaults by Owner. Owner shall be deemed to be in default hereunder in the event Owner shall fail to keep, observe or perform any covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Owner and Owner does not cure such default within 30 days after written notice thereof by Property Manager to Owner or, if such default cannot be cured within 30 days, then within such additional period as shall be reasonably necessary to effect a cure so long as Owner commences efforts to cure within the original 30-day period and thereafter diligently pursues the cure. Owner also shall be deemed to be in default hereunder in the event (i) Owner shall fail to pay any amount due Property Manager hereunder and Owner does not cure such default within seven (7) days, or (ii) Owner shall fail to timely provide funds for operation of the Properties as required by Section 8.03.

9.04  Remedies of Property Manager. Upon the occurrence of an event of default by Owner as specified in Section 9.03 hereof, Property Manager shall have the right to immediately terminate this Agreement.

9.05  Payment Obligations to Survive. Upon any termination in accordance with this Article IX, regardless of the cause, Owner shall continue to be obligated to pay Property Manager all amounts due in respect of the period prior to termination (including all expenses that are reimbursable in accordance with the terms of this Agreement and the Base Management Fee for the period ending on the date of termination) and all costs and expenses incurred by Property Manager in terminating its involvement with respect to the Properties.

9.06  Immediate Termination

(a) This Agreement may be terminated under the following conditions upon the occurrence of any of the following circumstances:

(i)  If either party shall default in the performance of any of its obligations hereunder and such default shall continue for ten (10) days after expiration of the cure period set forth in paragraph 9.01 herein, the party not in default may immediately terminate this Agreement, unless the nature of the obligation is such that more than ten (10) days is required for its performance, and the party in default has commenced performance within such ten (10) day period and thereafter diligently works to satisfy such obligation. The giving of such notice and any action taken by the receiving party in response to such notice shall not preclude the giving of a notice of termination without cause. The giving of such notice hereunder specifying that same is given pursuant to this Section 9.06 (b) and a ten (10) day cure period, shall effectively differentiate this Section 9.06 (b) from notice under Sections 9.01-9.04.

(ii)  In the event that the Properties, or any substantial portion thereof, is destroyed or significantly damaged by fire, tornado, windstorm, flood or other casualty during the Term of this Agreement, Property Manager or Owner may terminate this Agreement upon giving the

other party written notice of termination on or before the date which is thirty (30) days after the date of such event.

(iii)  If the Properties or any portion therefor are sold the property management agreement, if any, will automatically terminate.

(b)    Obligations Upon Termination.    Upon termination of this Agreement, each party shall promptly pay to the other, as soon as the same is determinable after the effective date of termination, all amounts due such other party under the terms of this Agreement, as of the date of termination, and upon such payment, neither party shall have any further claim or right against the other under this Agreement except as provided in this Section or as said claim or right expressly survive the termination of this Agreement.  As soon as practicable (but no later than five (5) business days) after termination, Property Manager shall (i) vacate the Property Manager's office (if any) maintained at the Properties; (ii) remove all signs that it has placed at the Properties indicating that it is the Property Manager of same; and (iii) deliver to Owner the originals (or copies if such originals are not available) of all books, permits, warranties, plans, records, leases, licenses, contracts and other documents pertaining to the Properties and its operation, any insurance policies, bills of sale or other documents evidencing title or rights of Owner, and any and all other records or documents pertaining to the Properties, provided such records or documents are not proprietary in nature to or the exclusive property of the Property Manager, which are necessary or desirable for the operation of the Properties and which are in the possession of Property Manager, its officers, agents or employees; provided, however, that Property Manager shall have the right to retain copies (in hard copy or electronic form) of all such materials for archival purposes.  Within twenty (20) days after the date of termination of this Agreement, Property Manager shall do the following: (i) deliver to Owner an accounting reflecting the balance of income and expenses of and from the Properties to the date of termination of the Agreement; (ii) assign all unexpired services and supply contracts to Owner or parties specified by Owner, provided Property Manager is released from any liability thereunder; and  (iii)  return intact (normal wear and tear excepted) all personal property owned exclusively by Owner in connection with the Properties, whether on the Properties or elsewhere and which is in Property Manager's possession or control. The bank accounts will be transferred as directed by Owner.  Any funds received by Property Manager after the date of termination which derive from the Owner shall be received in trust for the benefit of Owner and promptly remitted by Property Manager to Owner.

(c)  Upon the expiration or earlier termination of the Term of this Agreement, Property Manager shall deliver to Owner all funds (including tenant security deposits), books and records of Owner then in possession or control of Property Manager, and in the case of funds, after deducting therefrom such sums as are then due and owing to Property Manager hereunder.   Within sixty (60) days following expiration or termination of the Term, Property Manager shall deliver to Owner a final accounting, in writing, with respect to the operations of the Properties.

(d)  Should the Properties not be conveyed to Owner, this Agreement in its entirety shall be null and void and neither Owner nor Manager will have any further obligation thereof.

## ARTICLE X: INSURANCE

10.01. Required Insurance.

(a)  Commercial General Liability Insurance.   The Owner hereby agrees to maintain at all times and, when applicable, to provide evidence of Commercial General Liability Insurance coverage extended to include: 1) $1,000,000 limit each occurrence for bodily injury and property damage, $2,000,000 general aggregate limit, $1,000,000 products and completed operations limit; 2) $1,000,000 limit  for non-owned and hired automobile liability, 3) "your real estate manager" included within the definition of "Insured" in the policy language, and 4) Property Manager and "any and all of its affiliated or related entities, directors, officers, employees, servants and agents" to be specifically designated as "additional insured's" using ISO Additional Insured Endorsement CG 20 26 11 85 or an endorsement providing equivalent or broader coverage to the additional insured's.  Coverage for additional insured's shall apply as primary and non- contributing insurance before any other insurance or self-insurance, including any deductible, maintained by or provided to the additional insured's.

(b)  Workers' Compensation Insurance. Property Manager shall cause to be placed and kept in force worker's compensation insurance in compliance with all applicable federal, state and local laws and regulations covering all Project Employees of Property Manager. Owner shall reimburse Property Manager for the expense of such insurance on the basis of Property Manager's current worker's compensation rates, the payroll of the Properties and Property Manager's current premium discounts.  Owner's reimbursement obligation shall extend to any increase to expense derived from subsequent audits, and if any subsequent audit results in an increase in Property Manager's workers' compensation costs, Owner shall reimburse Property Manager for the increased amount.

(c)  Umbrella or Excess Liability Insurance: 1)  with limits of not less than $3,000,000 each occurrence and aggregate, 2) providing the following form coverage over the General Liability, Directors' and Officers' Liability and Employer's Liability policies,  3) coverage must include as insured's all entities that are additional insured's on the Commercial General Liability policy, and. 4) coverage for such additional insured's shall apply as primary before any other insurance of self-insurance, including any deductible, maintained by or provided to the additional  insured other than the Commercial General Liability, Directors' and Officers' Liability and Employer's Liability coverage's maintained by the Owner.

(d)  Insurance Certificates.  The insurance carriers providing the coverage's outlined above must be financially sound, rated A VII or better (or its equivalent) by A.M. Best Company, and must be licensed to do business in the State of Illinois.  Prior to the commencement of work under this Agreement, the Owner shall provide a current and original certificate of insurance providing evidence of the aforementioned insurance requirements.  Said certificate shall show the Property Manager and any and all of its affiliated or related entities, directors, officers, employees, servants and agents" as "additional insureds" on the Commercial General Liability, Directors' and Officers' Liability,  Umbrella and Excess Liability policies, and not merely a certificate holder.  A copy of the additional insured endorsement to the Commercial

General Liability policy shall be appended to the certificate of insurance. In the "Cancellation" provision of the certificate it shall read as follows: "Should any of the above described policies be canceled before the expiration date thereof, the issuing company will mail 30 days written notice to certificate holder named in the certificate". It is agreed by all parties that no work shall commence under the terms of this Agreement until said Certificate of Insurance is received and approved by the Property Manager. No later than the renewal date of any insurance policies required by this Contract, the Owner will supply the Manager with a current Certificate of insurance in compliance with the terms of this Agreement.

(f) <u>Property Insurance</u>. Owner shall cause to be placed and kept in force fire and extended coverage insurance and such other property and casualty insurance as Owner may elect, at Owner's expense.  Owner shall furnish to Property Manager appropriate endorsement and certificate of insurance with respect to any such insurance. Owner may participate in Manager's master insurance pool during the term of this Agreement, all costs and expenses to be borne by the Properties.

10.02.   <u>Property Manager's Liability Insurance</u>.  During the Term of this Agreement, Property Manager, at Property Manager's expense, shall carry and maintain liability insurance for the benefit of Property Manager (with blanket contractual liability coverage) on an "occurrence" basis, naming Owner as an additional insured, with limits of not less than $1,000,000 per occurrence (the "Manager's Liability Insurance"). Property Manager shall provide to Owner a written certificate from the carrier reflecting that Property Manager's Liability Insurance is effective in accordance with this Section 10.02 and that Property Manager's Liability Insurance will not be canceled or modified without at least 30 days prior written notice to Owner.

10.03.   <u>Handling Claims.</u>   Property Manager shall report to Owner, within a reasonable amount of time after Property Manager becomes aware of the same, all accidents occurring on or about the Properties and any insured damage or destruction to the Properties coming to the attention of Property Manager. Property Manager shall not be responsible for processing or settlement of claims against Owner's insurers.

**ARTICLE XI: MISCELLANEOUS PROVISIONS**

11.01   <u>Governing Law</u>.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the state of Illinois. Venue shall be in Cook County, Illinois.

11.02   <u>Owner Representative</u>.  Owner shall designate one person as Owner's representative in all dealings with Manager, who shall, until further notice, be the person executing this Agreement on behalf of Owner.  The person so acting as Owner's representative from time to time shall have full authority to bind Owner, and Manager may rely on any directive of such person without further authorization or inquiry.

11.03   <u>Notice</u>.  All notices permitted or required under the terms hereof shall be in writing and presented personally or given by certified or registered U.S. Mail or by overnight courier, postage prepaid, to the address for the parties set forth herein, or to such other address as

either party shall hereafter designate by written notice to the other party. Notices shall be deemed given or served for all purposes when presented by overnight courier or mailed as provided for herein.

11.04   Severability. If any term, covenant or condition of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term, covenant or condition to a person or circumstance other than those as to which it is held invalid or unenforceable, shall not be affected thereby. Each term, covenant or condition of this Agreement shall be enforced to the fullest extent permitted by law.

11.05   No Joint Venture or Partnership. Owner and Manager hereby agree that nothing contained herein or in any document executed in connection herewith shall be construed as making Manager and Owner joint ventures or partners. In no event shall Manager have any obligation or liability whatsoever with respect to any debts, obligations or liabilities of Owner.

11.06   Integration Clause. This Agreement embodies the entire agreement and understanding between Owner and Manager with respect to its subject matter and supersedes all prior agreements and understandings, written and oral, between Owner and Manager related to that subject matter.

11.07   Modification and Waiver. This Agreement and the obligations of the parties under this Agreement may be amended, waived and discharged only by an instrument in writing executed by the party against which enforcement of the amendment, waiver or discharge is sought.

11.08   Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of Manager and Owner and their respective successors and assigns. Any indemnity in favor of a party also will benefit each person who holds a direct or indirect ownership interest in such party and the respective officers, directors, trustees, agents, employees and affiliates of such party and such owners, and all such persons are third-party beneficiaries of this Agreement to the extent of their indemnity, defense and similar rights under the related provision and may enforce that provision against Owner or Manager, as applicable.

11.09   Assignment. Neither Owner nor Manager may assign this Agreement.

11.10   Third Party Facilitators. In or during the performance of its services, Manager may from time to time and on behalf of and with the consent of Owner, retain the services of third party consultants and professionals. These services include but are not limited to engineers, environmental experts, brokers, attorneys, property managers, etc. Manager may select and retain such consultants and professionals as Manager deems reasonably appropriate and necessary to facilitate the ownership transition and promote the general business activities of Owner. Manager shall notify Owner in writing of any such additional consultants and professionals and Owner reserves the right to reject for any reason whatsoever, any such consultants.

11.11   Relationship of the Parties.   Manager will be acting at all times as an independent contractor and not as an agent, representative or employee of Owner, except as specifically authorized by Owner and/or as specifically set forth in this Agreement.   Manager overtly represents that it is generally, but confidentially, engaged in performing services with other business entities similar to Owner, and therefore, shall never make any representations or commitments as an exclusive agent of Owner, except to the extent specifically authorized in writing by Owner.

11.12   Confidentiality.   Owner and Manager shall not discuss or otherwise communicate to any person or company anything discussed between the parties in connection with this Agreement except officers, directors, shareholders, attorneys, accountants and financial advisors associated with the Parties ("Representatives") who: (a) need access to such Confidential Information for the sincere purpose of facilitating this endeavor; (b) are bound by written confidentiality obligations no less protective of the confidential information than the terms contained herein and (c) the Owner and Manager consent to such a disclosure. Said Representatives agree to safeguard any and all confidential information from unauthorized use, access or disclosure using no less than a commercially reasonable degree of care.

11.13   Relationship of the Parties.   Anything in this Agreement to the contrary notwithstanding, no party hereto assumes any liabilities or obligations of the other party, whether past, present or future.

11.14   Time is of the Essence.   Time is of the essence as it relates to every provision of this Agreement

11.15   Cancellation in its Entirety.   Should the Properties not be conveyed to Owner, this Agreement in its entirety shall be null and void and neither Owner nor Manager will have any further obligation thereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals and have caused these presents to be signed respectively by their proper Manager(s) as dated below.

PRE HOLDINGS 14, LLC

By: _____

Name: _Peter Macky_____

Its: _Authorized Signatory_____


BETTER HOUSING FOUNDATION


By: _Andrew Belew_____

Name: _Andrew Belew_____

Its: _Chairman of Board_____

## EXHIBIT A

## LIST OF PROPERTIES

| ADDRESS | PIN(s) |
|---|---|
| 62-80 E 68th Street / 6752-54 S Michigan Ave, Chicago, IL 60637 | 20-22-301-038-0000 |
| 1704-10 E 77th / 7655-57 S East End Ave, Chicago, IL 60649 | 20-25-310-011 |
| 7938-48 S Greenwood Ave, Chicago, IL 60619 | 20-35-105-030; 20-35-105-031; 20-35-105-032; 20-35-105-033; 20-35-105-034; 20-35-105-035; and 20-35-105-036 |
| 7500-04 S Cottage Grove Ave / 749-755 E 75th Street, Chicago, IL 60619 | 20-27-407-019; and 20-27-407-020 |
| 7800 S South Shore Drive, Chicago, IL 60649 | 21-30-414-025 and 21-30-414-026 |
| 1745-57 E 69th / 6900-06 S Cregier Ave, Chicago, IL 60649 | 20-24-318-022 |
| 7250 S South Shore Drive, Chicago, IL 60649 | 21-30-107-022 |
| 2050-60 E 72nd Place, Chicago, IL 60649 | 20-25-207-044; 20-25-207-025; and 20-25-207-026 |
| 2025-35 E 72nd Street, Chicago, IL 60649 | 20-25-207-039 |
| 1516 E 70th Street, Chicago, IL 60637 | 20-23-418-012 and 20-23-418-013 |
| 233-241 E 115th Street, Chicago, IL 60628 | 25-22-303-001 and 25-22-303-002 |
| 7451 S Eberhart Ave / 500-512 E 75th Street, Chicago, IL 60619 | 20-27-226-032 |
| 7719-23 S Yates Blvd, Chicago, IL 60649 | 21-30-318-005 |

# EXHIBIT B

# BHF Foundation
# Bank Wiring Instruction

| | |
|---|---|
| **Bank Name:** | **Fifth Third Bank** |
| **Bank Address:** | **515 N. Flagler Drive. Suite 100** **West Palm Beach, Florida 33401** |
| **Bank Phone Number:** | **561-514-9900** |
| **Account Bank Name:** | **Better Housing Foundation** |
| **Bank Account #:** | **0113** |
| **U.S. ABA Routing wiring #:** | |
| **Swift code for International Transfer:** | **FTBCUS3C** |
| **Better Housing Foundation Address:** | **4 Dunbar Rd** **Palm Beach Gardens, Florida 33418** |
| **Better Housing Foundation Phone #:** | **561-691-0872** |