**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINDRAN PROPERTIES, LLC | ) | |
| (SHORELINE) | ) | Case No. 20 B 2834 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |

**UNITED STATES TRUSTEE'S OBJECTION TO NOTICE OF MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, (B) APPROVING THE FORM AND MANNER OF NOTICE, (C) APPROVING NOTICE OF THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING AND, IF NECESSARY, AN AUCTION; (E) APPROVING THE STALKING HORSE BID, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE PURCHASE AND SALE AGREEMENT, (B) AUTHORIZING THE SALE OF THE PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ALL DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF**

Patrick S. Layng, the United States Trustee for Region 11 (the "**U.S. Trustee**"), respectfully submits this Objection (the "**Objection**") to the Notice of Motion for Entry of (I) an Order (A) Approving Bid Procedures and Bid Protections in Connection With the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, and Encumbrances, (B) Approving the Form and Manner of Notice, (C) Approving Notice of the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing and, If Necessary, an Auction; (E) Approving the Stalking Horse Bid, and (F) Granting Related Relief; and (II) an Order (A) Approving the Purchase and Sale Agreement, (B) Authorizing the Sale of the Property Free and Clear of All Liens, Claims, Encumbrances and Interests, (C) Authorizing the Assumption and Assignment of All Designated Executory Contracts and Unexpired Leases,

and (D) Granting Related Relief (the "**Sale Motion**") [Dkt No. 26] filed by Lindran Properties, LLC (Shoreline) (the "**Debtor**"). In support of his Objection, the U.S. Trustee respectfully states as follows:

## INTRODUCTION

1. Without filing schedules or statements, and without providing notice to bondholders and tenants, the Debtor seeks authority to establish sale procedures to sell substantially all of its assets to a buyer (the "**Buyer**") pursuant to an asset purchase agreement (the "**APA**") executed weeks prior to the filing of the bankruptcy case. The APA, the proposed sale procedures, and the draft order are grossly tilted in favor of the Buyer and benefit virtually no other party in interest. Additionally, many of the bid and sale provisions violate the Bankruptcy Code and Federal Rules, and otherwise are improper. For those reason, as stated in more detail below, the Sale Motion should be denied.

## BACKGROUND[1]

<u>The Debtor</u>

2. On or about June 30, 2015, the Debtor was formed as an Illinois limited liability company. The Debtor was formed by Better Housing Foundation ("**BHF**") which is its sole member. The Debtor, like BHF, was formed as a not for profit entity with the intent of helping low income residents secure affordable housing.

3. To effectuate the stated intent, the Debtor purchased real property using the proceeds of certain Multifamily Housing Revenue Bonds (the "**Bonds**"). The Debtor used the proceeds of the Bonds to purchase thirteen (13) parcels of improved real property (collectively,

---

[1] This Background section is based on the facts known to the United States Trustee at this time and at this stage of the case without the benefit of the Debtor having filed schedules, a statement of financial affairs, or attending a meeting of creditors under Section 341.

the "**Property**"). Each parcel was improved with a building (each, a "**Building**"). The goal was to rent the units in each Building to low income tenants who would pay their rent, or some portion thereof, with Chicago Housing Authority ("**CHA**") vouchers. Additionally, as part of effectuating its goal of helping low income residents, the Debtor indicated it would not remove tenants solely if they failed to pay rent.

The Bonds

4.   To finance the purchase of the Property, the State of Illinois issued the Bonds. The Bonds are governed by that certain Trust Indenture (the "**Indenture**") dated as of July 1, 2016, by and between the Illinois Finance Authority as Issuer and Wilmington Trust, National Association, as Trustee. The Bonds were issued in three tranches: (i) $11,655,000 Series 2016A; (ii) $540,000 Taxable Series 2016B; and (iii) $1,365,000 Subordinate Series 2016C. The Bonds were secured by mortgages on the Property. Currently, the estimated amount due on the Bonds is $16,500,000, which includes both principal and interest.

5.   As with all bond issuances, the Bonds have an indenture trustee. The original trustee was Wilmington Trust which has been replaced by UMB Bank, N.A. (the "**Trustee**"). The Trustee has a fiduciary obligation to the bondholders and is permitted to act with direction from the "Controlling Holders," which is defined in the Indenture as "the Holders of the majority in aggregate principal amounts of the then Outstanding Senior Bonds."[2] The Trustee has been intimately involved in the sale of the Property, as will be discussed later, even though it is unclear whether the Trustee has direction from the Controlling Holders.

6.   At this time, it is unclear whether either the Debtor or the Trustee know the identities of the bondholders. Indeed, it appears that no bondholders were included in the creditor

---

[2] Senior Bonds refers to tranches (i) and (ii) as set forth above.

3

matrix filed by the Debtor. Similarly, it appears that no bondholders were notified by either the Debtor or the Trustee of this bankruptcy or of the intended sale of the Property. Nonetheless, the Trustee has participated or consulted with the Debtor on the putative sale of the Property and in this bankruptcy case.

Failure to Maintain the Property and Loss of Tax Abatement

7. The Property was acquired by the Debtor on or about July 29, 2016 using the proceeds of the Bonds. And, based on its purported charitable purpose and commitment not to evict a tenant solely for his or her inability to pay rent, the Debtor received real estate tax abatement from the State of Illinois. When the Debtor acquired the Property, its manager was L. Mark DeAngelis ("**DeAngelis**").

8. During DeAngelis' tenure, the Debtor failed to properly care for the Property and the City of Chicago (the "**City**") issued numerous citations for violations of the Chicago Building Code (the "**Building Code**"). As the condition of the buildings deteriorated, the CHA forbid tenants from using vouchers to pay their rent at those Buildings. And, based on the Debtor's failure to act in furtherance of its not for profit mission, in part, by evicting residents solely for non-payment of rent, the State of Illinois revoked the tax abatement. As a result, fewer tenants rented apartments, depressing the rental income from the Property. This cycle, coupled with the obligation to pay real estate taxes, caused a downward spiral and, to the extent it was ever able, the Debtor was unable to make necessary improvements or even to maintain the Property in a safe and habitable manner.

9. As a result of the downward spiral, and perhaps other reasons, DeAngelis was removed and a new president was installed for the Debtor. Despite the new president, the Debtor's business performance continued to deteriorate. The housing code violations continued to accrue

4

and the City continued to bring additional suits to enforce the Building Code. Ultimately, large portions of the buildings were not inhabited, and likely not inhabitable. And, as will be discussed below, the Debtor lost control of the Property to a receiver appointed by the Circuit Court of Cook County (the "**State Court**").

The Housing Court Cases and the Appointment of the Receiver

10. Because of the Debtor's failure to maintain and repair the Property it deteriorated and potentially affected the health and safety of the residents. That deterioration led to the City issuing citations for violations of the Building Code. These violations were not merely structural. Conversely, the violations included violations which should have been easy to rectify, and which would have taken incremental steps to protect the health and welfare of the tenants. But, the actions taken, if any, were insufficient.

11. Although the City issued citations with respect to the Property, the Debtor failed to correct the violations. As a result, beginning on November 11, 2016, less than six months after the Debtor purchased the Property, the City began to file suits against the Debtor and the Buildings in the State Court. In total, the City filed at least one case against each of the Buildings and the Debtor. There was not one property which was immune. The first case was filed on November 11, 2016 and additional suits were filed periodically with the last suit being filed on May 9, 2019. Initially, proposed bankruptcy counsel to the Debtor was counsel for the Debtor in the State Court.

12. Despite the existence of the numerous lawsuits against the Property, the Debtor failed to cure the Building Code violations. For nearly two and a half years, the City waited for the Debtor to correct the problems on the Property.[3] Tired of waiting, and perhaps recognizing that the Debtor was unable to care for the Buildings properly, the City began requesting that the State

---

[3] The Buildings and the Debtor and BHF attracted the attention of the Chicago Tribune. The Tribune has run multiple articles about the Buildings and the practices of the Debtor and BHF.

5

Court appoint receivers for the Buildings. The State Court appointed the first receiver on May 16, 2019. The receiver that was appointed was Community Initiatives, Inc. ("**Receiver**") and it was appointed for the Building located at 7250 S. South Shore. The Receiver, which is a not for profit community development corporation, was established by the not-for-profit Community Investment Corporation to take direct action to improve conditions in financially troubled multifamily properties and the communities in which they are located. Unlike a typical commercial receiver, this Receiver works to improve the properties at issue for the benefit of the community and of the low income residents in that community.

13. After the first receiver appointment, the State Court began to appoint the Receiver for each of the Buildings. A review of the orders appointing the Receiver shows that the Debtor failed to care for or maintain the Property and shows a blatant disregard for the welfare of the tenants. For example, the Order appointing the Receiver for 7250 S. South Shore requires that the Receiver cause the Building to be vacated and required the Receiver to repair (but not replace) the elevator so that residents could vacate the Building with their belongings. That same order also requires the Receiver to provide relocation assistance to the tenants.

14. Similarly, on June 20, 2019, the State Court appointed the Receiver as receiver for 7719-21 S. Yates. And, as with the 7250 S. South Shore property, the Receiver was required to cause the Building to be vacated and provide relocation assistance to the tenants.

15. Although the Receiver was required to cause residents to vacate two of the Buildings (and a third Building, 7800 S. South Shore Drive, was already vacant) the list of duties required of the Receiver shows that the Debtor failed to provide even minimal upkeep for the Property. For example, pursuant to the State Court orders, the Receiver was required to, among other things:

- Install smoke and carbon monoxide detectors
- Ensure all units had hot water
- Ensure that all entrance and egress points were secure
- Illuminate all common areas
- Remove sewage from basements
- Cover exposed electrical wiring
- Hire exterminators to abate rodent and pest infestation and
- Ensure that water from the boiler was not contaminating the potable water source.

And for one of the Buildings, the condition was so bad that the State Court ordered the Receiver to abate the rent pending further order of court. From a review of the orders appointing the Receiver and the duties that the Receiver is required to fulfill, it is clear that the Debtor abdicated its responsibility to care for the Property and the Trustee took no steps to protect the bondholders' collateral.

The District Court Litigation

16.     During the pendency of the housing court cases, the Debtor, BHF, and other related entities brought suit against DeAngelis and others seeking to recover damages allegedly caused by DeAngelis' and others malfeasance related to the Property. Counsel for the Plaintiffs was proposed bankruptcy counsel for the Debtor. After the Third Amended Complaint and the filing of a sanctions motion against Plaintiffs' counsel, the lawsuit was dismissed without prejudice. The sanctions motion asserted that the claims being made were already released pursuant to a global release.

The Intended Sale of the Property and the Companion Asset Purchase Agreement and the Bankruptcy

17.     For a number of months, the Debtor has been trying to unburden itself and sell the Property. According to the Debtor, its attempt to sell the Property has been hampered by the

condition into which it has allowed the Property to lapse. Despite the condition of the Property, the Debtor believes that it has found a buyer for the Property which will take it "as-is."

18.    It appears that the Trustee supports the sale. However, it is not clear that the Trustee has requisite direction from a majority of the Controlling Holders. The Trustee appears to be relying upon a fiduciary duty exception to the requirement that it take direction from a majority of the Controlling Holders to protect the Property (its collateral). In addition, the Trustee has agreed to fund a carve-out from the sale price to fund Debtor's counsel's fees and other professional fees and certain other administrative costs of this bankruptcy.

19.    To protect its sale of the Property, the Debtor has already executed an asset purchase agreement ("APA") with the Buyer which has been executed by the Trustee as a party. However, as will be discussed below, there are substantial problems with the APA, some of which point to a potential conflict of interest afflicting proposed Debtor's counsel.

20.    There are other provisions that protect the Debtor, the Buyer, and counsel – but none protect the people that the Debtor purports to be protecting – the residents.[4] Worse, the protections for the Buyer were negotiated by proposed Debtor's counsel – counsel that is attempting to be paid with money surcharged from the Property and only because the Trustee has agreed to a carve-out for them (whether it is entitled to agree to that carve-out or not).

21.    To protect itself, the Buyer required that the sale occur in a bankruptcy and that the Property be sold pursuant to section 363 of the Bankruptcy Code. Accordingly, on January 31, 2020, the Debtor filed its voluntary petition for relief under Chapter 11. It did so for the purpose of selling the Property for the sum of $3.9 million although the bond debt is in excess of $16 million. Further, the Receiver is owed substantial sums of money and has issued receiver

---

[4] It is unclear how the tenants will fare if PRE Holdings 14, LLC purchases the Property. *See* "Pangea has taken thousands to eviction court. The story of an apartment empire." Chicago Reader, May 16, 2019.

8

certificates which may have priority over the Bonds. And, it appears that the Debtor is also required to pay or cause to be paid all outstanding property taxes. *See* APA at ¶15. The purpose of the filing of the bankruptcy case is unclear. No party other than the buyer, the Trustee and its counsel, and Debtor's counsel seem to benefit from this case. Certainly, no distribution will be available for unsecured creditors

## OBJECTION

22.     The Debtor's proposed order and the APA both contain provisions that favor the Buyer to the detriment of the sale process and the other parties in interest, including the creditors. There are three general categories of objectionable provisions in the Draft Order and the APA: (i) lack of notice; (ii) deficiencies in the sale process and (iii) the Buyer's attempt to evade the requirement of having to demonstrate its entitlement to the break-up fee and expense reimbursement.

**THE DEBTOR HAS NO INTENT TO REORGANIZE AND INSTEAD SEEKS TO RUSH THROUGH A SALE REPLETE WITH OBJECTIONABLE PROVISIONS**

23.     As a threshold matter, before addressing the particular problems posed by the Draft Order and APA, the Court should consider whether the sale process should proceed at all. The Debtor seeks to reap the benefits of a bankruptcy filing without complying with any of the associated burdens. The case was filed for the sole purpose of selling the Property. As such, it appears that the Debtor does not intend to file a plan, as required by section 1106(a)(5), or to make a distribution to any creditors other than the Trustee. Indeed, had the Buyer not paid the first $50,000 to fund proposed counsels' fees, this case might not have been filed. Moreover, had the Trustee not agreed to a carve-out in the amount of up to $300,000 to pay for the Debtor's legal

fees, this case might not continue.[5]

24.     While it seems clear that the Debtor has no intention of confirming a plan in this case, it is clear that the Debtor and the Trustee reserve for themselves the right to disburse the sale proceeds in any manner they wish. *See* APA at ¶ 5(g). While, on its face, appearing only to be sale, the Debtor's proposed procedure allows the Debtor to disburse the sale proceeds absent further order of court and is, therefore, more than just a sale. *See*, *In re Braniff Airways, Inc.*, 700 F.2d 935, 939 (5th Cir. 1983). Through the APA, the Debtor is seeking to accomplishes what should be done by a plan of reorganization with the many safeguards attendant to the plan confirmation process. *Braniff*, 700 F.2d at 939-40. Simply, the sale process proposed by the Debtor, the Trustee, and the Buyer constitutes a *sub rosa* plan and cannot be approved.

25.     If the Debtor does not file a plan, it is not complying with its obligations as a debtor under section 1106. *See* 11 U.S.C. § 1106(a)(5). If the Debtor filed this case never intending to file a plan, the case might have been filed in bad faith. If the Debtor filed the case without intending to propose a plan, cause may exist to dismiss the case. *See generally*, 11 U.S.C. §1112(b); *In re Bartle*, 560 F.3d 724, 730 (7th Cir. 2009) ("dismissal is appropriate if it is unreasonable to expect that a reorganization plan can be confirmed").

**THE SALE PROCESS VIOLATES THE DUE PROCESS RIGHTS OF THE BONDHOLDERS AND TENANTS**

26.     If the preliminary problems can be overcome, there are still a myriad of due process and notice problems with the proposed sale that militate towards denying the Motion. First, it appears that the Debtor failed to serve the bondholders or the tenants with the Motion. The substantive rights of both groups are materially impacted by the proposed sale, and each has

---

[5] The APA contains a provision, at Exhibit A, which allows the carve-out to be increased without approval from this Court if Debtor's counsel performs additional services at the request of the Trustee.

10

standing to be heard. Unless and until sufficient notice has been provided to those parties in interest, the Motion should be denied.

27. Moreover, and importantly, the Draft Order is not a freestanding order because it is not self-contained. Rather, it requires parties to refer to the Motion for certain information, including, but not limited to, the bid procedures. This can cause unnecessary confusion as to what has been approved.

28. Additionally, the Draft Order provides that "The Motion is Granted." Again, this makes the Draft Order dependent on another document and not free standing. Therefore, approving all the relief requested in the Motion does not provide notice of all of the relief granted. And, it allows the Debtor to insert provisions in the Motion but not in the Order, and then assert that they have the force of a court order.

**THE SALE PROCESS IS FLAWED**

29. Not only is the notice of the Motion deficient, but the sale process is structured in a way to improperly benefit the Buyer. There are significant concerns raised by the sale process which must be rectified before the Draft Order and the form of the APA can be approved, if at all.

30. Some of the process problems are:

   a. The APA assumes that the bondholders hold the first priority lien in the Property when there may be outstanding taxes and the receiver certificate liens may have priority over the bondholders (*see* APA at second Whereas clause, ¶5(h), ¶5(i));

   b. The Assumption Notices do not contain the proposed cure amount or the adequate assurance of future performance and in the event of any objection to the assumption, makes the assumption effective as of the date the counter-party receives the assumption notice (*see* Exhibit 2 to Draft Order);

   c. The APA provides that the Trustee and the Debtor determine how to distribute the proceeds of the Sale without further court order or reference to the priority scheme mandated by the Bankruptcy Code (*see* APA at ¶5(g));

   d. There is no provision for compensating the Receiver for the services rendered during the bankruptcy case;

11

e. The Debtor is required to provide the bid procedures to any party that requests them, but there is no deadline for doing so (*see* Draft Order at ¶4);

f. The Debtor is authorized to perform any obligations set forth in the APA that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order (*see* Draft Order at ¶ 7) which seems to suggest that the Debtor can take steps to favor the Buyer and to consummate the sale to the Buyer absent any order of Court, in direct contravention of section 363;

g. The Draft Order and APA contemplate that the Trustee can credit bid although there may be other secured creditors with liens that have priority over the bondholders' liens;

h. A forty-five day bid deadline may provide enough time for alternate bidders to conduct due diligence and bid;

i. There is no process to allow a potential buyer to conduct due diligence and no requirement that the Debtor cooperate;

j. There is no deadline by which the Debtor must file and serve any proposed order approving the sale;

k. The Debtor improperly seeks to cut-off successor liability;

l. The Trustee is granted a waiver and release of claims and exculpation in the APA (*see* APA at ¶¶ 11, 32) which is inappropriate and, even if appropriate, is not narrowly tailored and not limited to necessary parties;

m. Debtor's counsel is paid from the proceeds of the Property pursuant to a carve-out granted by the Trustee;

n. There is the opportunity for Debtor's counsel to increase the carve-out by doing additional work for the benefit of the Trustee;

o. The APA contemplates that contracts that are not assumed are deemed rejected, in contravention of the Bankruptcy Code (*see* APA at ¶9); *see* 11 U.S.C. §365;

p. The Debtor must consult only with the Trustee with respect to the highest and best bid, which ignores that there may be other lienholders with liens on the Property – liens that may have priority over the bondholders' liens – that should be consulted.

**The Sale Order and APA Provide for a Break-Up Fee and Expense Reimbursement Without Proof that the Buyer Benefited the Estate**

31. The Draft Order improperly provides that the Buyer is automatically entitled to its break-up fee and expense reimbursement if it is not the successful buyer.

32. "The proper standard for evaluating a breakup fee should be whether the interests of all concerned parties are best served by such a fee. The test is whether the payment of a breakup

fee is in the best interests of the estate." *In re S.N.A. Nut Co.,* 186 B.R. 98, 104 (Bankr. N.D. Ill 1995); *see also*, *In re O'Brien Envtl. Energy*, 181 F.3d 527, 537 (3d Cir, 1999) (break-up fee was rejected because it did not serve its purpose).

33. Further, "absent compelling circumstances which clearly indicate that payment of the fee would be in the best interests of the estate, breakup fees should not be awarded in bankruptcy auction sales." *S.N.A. Nut*, 186 B.R. at 105.

34. Similarly, the Debtor seeks to reimburse the Buyer's expenses if it is not the successful buyer. But, like discussed with respect to break-up fees, expense reimbursement must benefit the estate. *Id.*

35. Unless the Buyer can show that it has benefited the estate by serving as the stalking horse, it should not be entitled to recover a break-up fee or recover its expenses.

## CONCLUSION

36. For the foregoing reasons, the Motion and the form of APA should not be approved unless modified as set forth herein and to comply otherwise with the Bankruptcy Code.

RESPECTFULLY SUBMITTED:

PATRICK S. LAYNG
UNITED STATES TRUSTE

DATED: February 14, 2020     By:   /s/ *Jeffrey L. Gansberg*
                                    Jeffrey L. Gansberg, Attorney
                                    OFFICE OF THE U.S. TRUSTEE
                                    219 South Dearborn Street, Room 873
                                    Chicago, Illinois 91914
                                    (312) 886-3327

13