**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINDRAN PROPERTIES, LLC | ) | |
| (SHORELINE) | ) | Case No. 20 B 2834 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |

**UNITED STATES TRUSTEE'S OBJECTION TO MOTION FOR ENTRY
OF AGREED ORDER AUTHORIZING SURCHARGE OF LENDER'S
COLLATERAL UNDER SECTION 506(c) OF THE BANKRUPTCY CODE**

Patrick S. Layng, the United States Trustee for Region 11 (the "**U.S. Trustee**"), respectfully submits this Objection (the "**Objection**") to the *Motion for Entry of Agreed Order Authorizing Surcharge of the Lender's Collateral Under Section 506(c) of the Bankruptcy Code* (the "**Surcharge Motion**") [Dkt No. 24] filed by Lindran Properties, LLC (Shoreline) (the "**Debtor**"). In support of his Objection, the U.S. Trustee respectfully states as follows:

**INTRODUCTION**

1.      During the first days of this case, and by consent, the Debtor seeks to surcharge the collateral of the holders of bonds that were issued by the State of Illinois to fund the Debtor's purchase of certain real property. The purported surcharge is improper because the Debtor: (i) seeks to direct the disposition of the proceeds of the surcharge; (ii) assumes that the bondholders hold the first priority lien on the funds to be surcharged and does not seek approval from any other party that may hold the first priority liens; and (iii) seeks to bootstrap the use of cash collateral and the granting of priming liens to the bondholders into the Surcharge Motion. For those reason, as stated in more detail below, the Surcharge Motion should be denied.

## BACKGROUND[1]

<u>The Debtor</u>

2. On or about June 30, 2015, Debtor was formed as an Illinois limited liability company. The Debtor was formed by Better Housing Foundation ("**BHF**"), which is its sole member. The Debtor, like BHF, was formed as a not for profit entity with the intent of helping low income residents secure affordable housing.

3. To effectuate the stated intent, the Debtor purchased real property using the proceeds of certain Multifamily Housing Revenue Bonds (the "**Bonds**"). The Debtor used the proceeds of the Bonds to purchase thirteen (13) parcels of improved real property (collectively, the "**Property**"). Each parcel was improved with a building (each, a "**Building**"). The goal was to rent the units in each Building to low income tenants who would pay their rent, or some portion thereof, with Chicago Housing Authority ("**CHA**") vouchers. Additionally, as part of effectuating its goal of helping low income residents, the Debtor indicated that it would not remove tenants solely on the basis of failure to pay rent.

<u>The Bonds</u>

4. To finance the purchase of the Property, the State of Illinois issued the Bonds. The Bonds are governed by that certain Trust Indenture (the "**Indenture**") dated as of July 1, 2016, by and between the Illinois Finance Authority as Issuer and Wilmington Trust, National Association, as Trustee. The Bonds were issued in three tranches: (i) $11,655,000 Series 2016A; (ii) $540,000 Taxable Series 2016B; and (iii) $1,365,000 Subordinate Series 2016C. The Bonds were secured

---

[1] This Background section is based on the facts known to the United States Trustee at this time and at this stage of the case without the benefit of the Debtor having filed schedules, a statement of financial affairs, or attending a meeting of creditors under Section 341.

by mortgages on the Property. Currently, the estimated amount due on the Bonds is $16,500,000, which includes both principal and interest.

5.   As with all bond issuances, the Bonds have an indenture trustee. The original trustee was Wilmington Trust which has been replaced by UMB Bank, N.A. (the "**Trustee**"). The Trustee has a fiduciary obligation to the bondholders and is permitted to act with direction from the "Controlling Holders," which is defined in the Indenture as "the Holders of the majority in aggregate principal amounts of the then Outstanding Senior Bonds."[2] The Trustee has been intimately involved in the sale of the Property, as will be discussed later, even though it is unclear whether the Trustee has direction from the Controlling Holders.

6.   At this time, it is unclear whether either the Debtor or the Trustee know the identities of the bondholders. Indeed, it appears that no bondholders were included in the creditor matrix filed by the Debtor. Similarly, it appears that no bondholders were notified by either the Debtor or the Trustee of this bankruptcy or of the intended sale of the Property. Nonetheless, the Trustee has participated or consulted with the Debtor on the putative sale of the Property and in this bankruptcy case.

Failure to Maintain the Property and Loss of Tax Abatement

7.   The Property was acquired by the Debtor on or about July 29, 2016 using the proceeds of the Bonds. And, based on its purported charitable purpose and commitment not to evict a tenant solely for his or her inability to pay rent, the Debtor received real estate tax abatement from the State of Illinois. When the Debtor acquired the Property, its manager was L. Mark DeAngelis ("**DeAngelis**").

---

[2] Senior Bonds refers to tranches (i) and (ii) as set forth above.

8. During DeAngelis' tenure, the Debtor failed to properly care for the Property and the City of Chicago (the "**City**") issued numerous citations for violations of the Chicago Building Code (the "**Building Code**"). As the condition of the Buildings deteriorated, the CHA forbid tenants from using vouchers to pay their rent at those Buildings. And, based on the Debtor's failure to act in furtherance of its not for profit mission, in part, by evicting residents solely for non-payment of rent, the State of Illinois revoked the tax abatement. As a result, fewer tenants rented apartments, depressing the rental income from the Property. This cycle, coupled with the obligation to pay real estate taxes, caused a downward spiral and, to the extent it was ever able, the Debtor was unable to make necessary improvements or even to maintain the Property in a safe and habitable manner.

9. As a result of the downward spiral, and perhaps other reasons, DeAngelis was removed and a new president was installed for the Debtor. Despite the new president, the Debtor's business performance continued to deteriorate. The housing code violations continued to accrue, and the City continued to bring additional suits to enforce the Building Code. Ultimately, large portions of the buildings were not inhabited, and likely not inhabitable. And, as will be discussed below, the Debtor lost control of the Property to a receiver appointed by the Circuit Court of Cook County (the "**State Court**").

The Housing Court Cases and the Appointment of the Receiver

10. Because of the Debtor's failure to maintain and repair the Property it deteriorated and potentially affected the health and safety of the residents. That deterioration led to the City issuing citations for violations of the Building Code. These violations were not merely structural. Conversely, the violations included violations which should have been easy to rectify, and which

would have taken incremental steps to protect the health and welfare of the tenants. But, the actions taken, if any, were insufficient.

11. Although the City issued citations with respect to the Property, the Debtor failed to correct the violations. As a result, beginning on November 11, 2016, less than six months after the Debtor purchased the Property, the City began to file suits against the Debtor and the Buildings in the State Court. In total, the City filed at least one case against each of the Buildings and the Debtor. There was not one Building that was immune. The first case was filed on November 11, 2016 and additional suits were filed periodically with the last suit being filed on May 9, 2019. Initially, proposed bankruptcy counsel to the Debtor was counsel for the Debtor in the State Court.

12. Despite the existence of the numerous lawsuits against the Property, the Debtor failed to cure the Building Code violations. For nearly two and a half years, the City waited for the Debtor to correct the problems on the Property.[3] Tired of waiting, and perhaps recognizing that the Debtor was unable to care for the Buildings properly, the City began requesting that the State Court appoint receivers for the Buildings. The State Court appointed the first receiver on May 16, 2019. The receiver that was appointed was Community Initiatives, Inc. ("**Receiver**") and it was appointed for the Building located at 7250 S South Shore. The Receiver, which is a not for profit community development corporation, was established by the not-for-profit Community Investment Corporation to take direct action to improve conditions in financially troubled multifamily properties and the communities in which they are located. Unlike a typical commercial receiver, this Receiver works to improve the properties at issue for the benefit of the community and of the low income residents in that community.

---

[3] The Buildings and the Debtor and BHF attracted the attention of the Chicago Tribune. The Tribune has run multiple articles about the Buildings and the practices of the Debtor and BHF.

13. After the first receiver appointment, the State Court began to appoint the Receiver for each of the Buildings. A review of the orders appointing the Receiver shows that the Debtor failed to care for or maintain the Property and shows a blatant disregard for the welfare of the tenants. For example, the Order appointing the Receiver for 7250 S. South Shore requires that the Receiver cause the Building to be vacated and required the Receiver to repair (but not replace) the elevator so that residents could vacate the Building with their belongings. That same order also requires the Receiver to provide relocation assistance to the tenants.

14. Similarly, on June 20, 2019, the State Court appointed the Receiver as receiver for 7719-21 S. Yates. And, as with the 7250 S. South Shore property, the Receiver was required to cause the Building to be vacated and provide relocation assistance to the tenants.

15. Although the Receiver was required to cause residents to vacate two of the Buildings (and a third Building, 7800 S. South Shore Drive, was already vacant) the list of duties required of the Receiver shows that the Debtor failed to provide even minimal upkeep for the Property. For example, pursuant to the State Court orders, the Receiver was required to, among other things:

- Install smoke and carbon monoxide detectors
- Ensure all units had hot water
- Ensure that all entrance and egress points were secure
- Illuminate all common areas
- Remove sewage from basements
- Cover exposed electrical wiring
- Hire exterminators to abate rodent and pest infestation and
- Ensure that water from the boiler was not contaminating the potable water source.

And for one of the Buildings, the condition was so bad that the State Court ordered the Receiver to abate the rent pending further order of court. From a review of the orders appointing the Receiver

and the duties that the Receiver is required to fulfill, it is clear that the Debtor abdicated its responsibility to care for the Property and the Trustee took no steps to protect the bondholders' collateral.

### The District Court Litigation

16. During the pendency of the housing court cases, the Debtor, BHF, and other related entities brought suit against DeAngelis and others seeking to recover damages allegedly caused by DeAngelis' and others malfeasance related to the Property. Counsel for the Plaintiffs was proposed bankruptcy counsel for the Debtor. After the Third Amended Complaint and the filing of a sanctions motion against Plaintiffs' counsel, the lawsuit was dismissed without prejudice. The sanctions motion asserted that the claims being made were already released pursuant to a global release.

### The Intended Sale of the Property and the Companion Asset Purchase Agreement and the Bankruptcy

17. For a number of months, the Debtor has been trying to unburden itself and sell the Property. According to the Debtor, its attempt to sell the Property has been hampered by the condition into which it has allowed the Property to lapse. Despite the condition of the Property, the Debtor believes that it has found a buyer for the Property which will take it "as-is".

18. It appears that the Trustee supports the sale. However, it is not clear that the Trustee has requisite direction from a majority of the Controlling Holders. The Trustee appears to be relying upon a fiduciary duty exception to the requirement that it take direction from a majority of the Controlling Holders to protect the Property (its collateral). In addition, the Trustee has agreed to fund a carve-out from the sale price to fund Debtor's counsel's fees and other professional fees and certain other administrative costs of this bankruptcy.

19. To protect its sale of the Property, the Debtor has already executed an asset purchase agreement ("APA") with the Buyer which has been executed by the Trustee as a party. However, there are substantial problems with the APA, some of which point to a potential conflict of interest afflicting proposed Debtor's counsel.

20. A review of the APA leads the U.S. Trustee to have significant concerns about the sale, the sale process, the lengths that the Debtor will go to sell the Property, and the potential conflicts that arose during the negotiation of the APA. Some of the concerns are as follows:

- The payment of legal fees for Debtor's counsel by the buyer or the Trustee[4] (*see* APA at ¶2(a);
- A determination that the Trustee's liens are the first priority liens despite the Receiver's liens (*see* APA at second WHEREAS clause, page 1; ¶5(h) and (i));
- The release of the Debtor and the Trustee and the exculpation of the Debtor (*see* APA at ¶11; ¶32);
- That the Debtor and the Trustee determine the distribution of the proceeds of the sale (*see* APA at ¶5(g));
- Debtor's counsel negotiated its own carve-out from the proceeds of the sale (*see* APA at ¶2(a));
- Debtor's counsel negotiated an additional carve-out if the Trustee requires it to perform additional tasks (*see* Exhibit C to the APA); and
- Provides for "deemed" rejection of executory contracts (*see* APA at ¶9).

There are other provisions that protect the Debtor, the Buyer, and counsel – but none protect the people that the Debtor purports to be protecting – the residents.[5] Worse, the protections for the buyer were negotiated by proposed Debtor's counsel – counsel that is attempting to be paid with

---

[4] It is unclear whether the fees should be deemed paid by the buyer because they made payment directly to Debtor's counsel or whether the fees should be deemed paid by the Trustee because, arguably, the bondholders are undersecured creditors and the payment reduces payment to them. Irrespective of which is correct, Debtor's counsel is negotiating an APA which provides benefits to a party that is not their client and to which they should be adverse.

[5] It is unclear how the tenants will fare if PRE Holdings 14, LLC purchases the Property. *See* "Pangea has taken thousands to eviction court. The story of an apartment empire." Chicago Reader, May 16, 2019.

money surcharged from the Property and only because the Trustee has agreed to a carve-out for them (whether it is entitled to agree to that carve-out or not).

21. To protect itself, the Buyer required that the sale occur in a bankruptcy and that the Property be sold pursuant to section 363 of the Bankruptcy Code. Accordingly, on January 31, 2020, the Debtor filed its voluntary petition for relief under Chapter 11. It did so for the purpose of selling the Property for the sum of $3.9 million although the bond debt is in excess of $16 million. Further, the Receiver is owed substantial sums of money and has issued receiver certificates which may have priority over the Bonds. And, it appears that the Debtor is also required to pay or cause to be paid all outstanding property taxes. *See* APA at ¶15. The purpose of the filing of the bankruptcy case is unclear. No party other than the Buyer, the Trustee and its counsel, and Debtor's counsel seem to benefit from this case. Certainly no distribution will be available for unsecured creditors.

**OBJECTION**

22. The Court should deny the Surcharge Motion for three reasons. First, the Debtor improperly seeks to direct the usage of the proceeds of the surcharge contrary to the terms of the Bankruptcy Code. Second, the Debtor has failed to show that the party that has agreed to the surcharge holds the senior lien on the proceeds to be surcharged. Third, under the guise of a section 506(c) surcharge, the Debtor seeks to use cash collateral and to grant priming liens to a secured creditor, although the Debtor is not operating and its properties are being maintained by a state court appointed receiver.

    a. **The Debtor Cannot Direct the Use of the Proceeds from the Surcharged Collateral**

23. In contravention of its plain meaning, the Debtor and the Trustee are seeking to use the surcharge provision of the Bankruptcy Code to pay for this case.

9

24. The Surcharge Motion and accompanying order attempt to direct the use of the proceeds from the surcharged collateral. One of the purported uses is to pay Debtor's counsel. This attempt to direct the use of the surcharge proceeds violates section 506(c) and could reorder the priority scheme of the Bankruptcy Code by allowing Debtor's counsel to be paid in full before other administrative claimants or other creditors that may have priority over Debtor's counsel. *See* 11 U.S.C. §506(c); *Czyzewski v. Jevic Hldg Corp.*, 137 S.Ct 973 (2017); *see also*, *In re Resource Tech. Corp.*, 356 B.R. 435, 444-447 (Bankr. N.D. Ill. 2006); *In re Ben Franklin Retail Store Inc.*, 210 B.R. 315, 317-319 (Bankr. N.D. Ill. 1997).

25. In *Jevic*, the Supreme Court recognized that lower courts have approved procedures that "that violate ordinary priority rules" in limited circumstances. *See Jevic*, 137 S.Ct. at 985. But none of the examples compare to what the Debtor is seeking from this Court. The *Jevic* court acknowledged that the lower courts recognized circumstances that would "'enable a successful reorganization and make even the disfavored creditors better off.'" *Jevic*, 137 S.Ct. at 985. Conversely, in *Jevic*, the Supreme Court found that the proposed alteration of the priority scheme "does not preserve the debtor as a going concern; it does not make the disfavored creditors better off; it does not promote the possibility of a confirmable plan; it does not help to restore the *status quo ante*; and it does not protect reliance interests." *Id*. at 985-86. Here, the Debtor is not a going concern, and its stated and sole purpose for this bankruptcy case is to sell the Property. Here too, the proposed distribution of the surcharge proceeds does not make the disfavored creditors better off – it makes only the Trustee and Debtor's counsel better off. And here, it does not help promote the possibility of a plan, because there will be no plan. The proposed surcharge meets none of the rationale recognized, but not necessarily approved by, the *Jevic* court.

26. In the Motion, the Debtor indicates that it and the Trustee have agreed that the

Trustee will allow up to $300,000 to be surcharged from the proceeds of the sale to pay certain, select expenses (the "**Carve-Out**"). The explanation of the Carve-Out is qualified further by reference to Exhibit A. *See* Motion at ¶ 12.

27. A review of Exhibit A indicates that the Carve-Out is not necessarily limited to $300,000. Rather, the Debtor and the Trustee can agree to increase the Carve-Out by their agreement (and without further order of Court). *See* Exhibit A ("The Debtor and the Trustee agree to renegotiate the Professional Fees Carve-Out in the event: . . ."). A cursory review of the events which allow for renegotiation seem to benefit the Trustee – indeed two of the items which could cause an increase in the Carve-Out are explicitly listed as "solely in the discretion of the Trustee". *Id.* It appears that the Carve-Out exists for the benefit of the Trustee and for Debtor's counsel without corresponding benefit to the Debtor or its creditors.

28. Further, although the Trustee and Debtor's counsel seek to set the size of the Carve-Out and direct the distribution of the proceeds of the surcharge, such proceeds are not the bondholders' or Trustee's property. *See Ben Franklin*, 210 B.R. at 319 (citation omitted). *See* 11 U.S.C. §506(c) ("The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."); *see also*, *RTC*, 356 B.R. 445 (quoting *Ben Franklin*, 210 B.R. at 317).

29. Both *Ben Franklin* and *RTC* are clear, only the chapter 11 debtor (or chapter 7 or chapter 11 trustee) can surcharge the secured creditor's collateral and the recovery from the surcharge belongs to the estate. *See Ben Franklin*, 210 B.R. at 319 (citation omitted). And, once a surcharge has been approved, the funds recovered are property of the Debtor's estate and are not

the property of any one creditor. *RTC*, 356 B.R. 445 (quoting *Ben Franklin*, 210 B.R. at 317).

30. The Debtor and the Trustee have no right to direct the distribution of proceeds of the estate. And they certainly cannot do so without a plan of reorganization confirmed by this Court after notice to all creditors and a confirmation hearing.

> b. **The Bondholders Are Not Necessarily the Senior Lienholder and Cannot Consent to the Surcharge of Another Creditor's Collateral**

31. Although Debtor's counsel and the Trustee presuppose that they can surcharge the collateral for the benefit of select parties, that supposition relies upon the assumption that the bondholders hold the first priority lien on the Property.

32. Initially, to the extent that real estate taxes are due and owing on the Property, such real estate taxes would prime the lien position of the bondholders. Because the Debtor has not filed its schedules and does not propose to file schedules for several weeks, the extent of real estate tax liability remains unknown.

33. Similarly, there is another lien that primes the bondholders – the receivers' lien which was created pursuant to Illinois statute. *See* 65 ILCS 5/11-31-2.

34. The Receiver has issued receiver certificates to pay the costs that it has incurred maintaining the Property. A number of these certificates have already been approved by the State Court.

35. Those receiver certificates constitute a first priority lien on the Property, subject only to unpaid taxes. *See* 65 ILCS 5/11-31-2.

36. In this case, Debtor's counsel and the Trustee cannot agree to a surcharge of the proceeds from the sale of the Property until it becomes clear that the bondholders will receive proceeds from the sale.

      c. **The Debtor's Request to Use Cash Collateral Must Be Denied**

37.    In addition to improperly seeking to surcharge the Property, the Debtor and the Trustee have manufactured a method to ensure that the bondholders' lien is a first priority lien – allow the Debtor to use the bondholders' "cash collateral" and provide replacement liens and a super-priority claim in the event of diminution. Further, the draft order provides that the Debtor's stipulations will be binding on others with the mere passage of time.

38.    What is never explained in the Motion is why the Debtor would need to use cash collateral at all. To the contrary, it appears that the Debtor does not need to use any cash collateral -- the Debtor is not operating and the Receiver is in possession of and maintaining the Property. Further the Debtor did not include a cash collateral budget with the Motion. Either the Debtor does not need to use cash collateral or it is not interested in apprising parties in interest how it intends to use that cash collateral. In either event, this Court should deny the request to use cash collateral.

39.    There is no reason to grant the Debtor the use of cash collateral in this case.

## CONCLUSION

40.    For the reasons stated above, this Court should deny the Motion.

RESPECTFULLY SUBMITTED:

PATRICK S. LAYNG
UNITED STATES TRUSTE

DATED: February 14, 2020      By:   /s/ *Jeffrey L. Gansberg*
                                              Jeffrey L. Gansberg, Attorney
                                              OFFICE OF THE U.S. TRUSTEE
                                              219 South Dearborn Street, Room 873
                                              Chicago, Illinois 91914
                                              (312) 886-3327